IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

COMMITTEE FOR JUSTICE & FAIRNESS (CJF), a non-profit organization,
*Plaintiff/Appellee*,

*v.*

ARIZONA SECRETARY OF STATE'S OFFICE, a governmental entity; KEN
BENNETT, in his official capacity as Secretary of State; AMY CHAN, in her
official capacity as State Elections Director for the Secretary of State; WILLIAM
G. MONTGOMERY, Maricopa County Attorney, in his official capacity;
MARICOPA COUNTY ATTORNEY'S OFFICE, a governmental entity,
*Defendants/Appellants*.

No. 1 CA-CV 13-0037
FILED 08-07-2014

Appeal from the Superior Court in Maricopa County
No. LC2011-000734-001
The Honorable Crane McClennen, Judge

**VACATED IN PART; REVERSED IN PART**

COUNSEL

Polsinelli, P.C., Phoenix
By Marty Harper, Thomas K. Irvine
*Counsel for Plaintiff/Appellee*

Maricopa County Attorney's Office, Phoenix
By M. Colleen Connor, Bruce P. White
*Counsel for Defendants/Appellants*

Ballard Spahr, L.L.P., Phoenix
By Joseph A. Kanefield, Brunn W. Roysden III
*Counsel for Amicus Curiae Citizens Clean Elections Commission*

Scharf-Norton Center for Constitutional Litigation, Phoenix
By Nicholas C. Dranias
*Counsel for Amicus Curiae Goldwater Institute*

---

**OPINION**

Judge Lawrence F. Winthrop delivered the opinion of the Court, in which Presiding Judge Patricia A. Orozco and Judge Kenton D. Jones joined.

---

**W I N T H R O P,** Judge:

**¶1** The Committee for Justice and Fairness ("CJF") is a national political organization that operates primarily for the purpose of influencing state and local elections. In 2010, CJF financed the creation and dissemination of an advertisement broadcast on a Phoenix-area television station immediately before the general election. The ad attacked the record of one of the two candidates for Attorney General, Tom Horne. After learning CJF had failed to follow Arizona's registration and disclosure requirements applicable to political committees that raise and spend money to influence the outcome of an election in Arizona, *see generally* Ariz. Rev. Stat. ("A.R.S.") §§ 16-901 to -925,[1] the Maricopa County Attorney's Office ("MCAO") issued an order pursuant to § 16-924,[2] requiring CJF to register as a political committee and comply with Arizona's campaign finance reporting and disclosure laws.

**¶2** After an Administrative Law Judge ("ALJ") recommended MCAO's order be upheld, the Maricopa County Attorney issued a Final Decision ordering CJF to register as a political committee and comply with the applicable campaign reporting and disclosure requirements. The

---

[1] We cite the current version of the applicable statutes unless otherwise indicated.

[2] Section 16-924 provides for the Attorney General or a county attorney to issue orders requiring compliance and otherwise assessing civil penalties for violations of Arizona's laws pertaining to campaign contributions and expenses.

superior court reversed and vacated the recommended order and Final Decision after concluding (1) the ad was not subject to Arizona's disclosure requirements because it was merely issue-oriented speech rather than express advocacy, and (2) the disclosure statutes at issue are unconstitutional.

¶3          In this opinion, we conclude CJF's advertisement qualifies as "express advocacy" as defined in A.R.S. § 16-901.01(A)(2)(a), the advertisement qualifies as an independent expenditure designed to influence the 2010 Attorney General election, and CJF is a political committee that must comply with Arizona's political committee registration and disclosure requirements. We also conclude the superior court erred in finding the applicable statutes unconstitutional. Accordingly, we vacate the portion of the superior court's judgment holding unconstitutional A.R.S. § 16-901.01(A)(1) and the now-repealed subpart (b) of § 16-901.01(A)(2), and reverse the remainder of the court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶4          In 2010, shortly before the November general election, CJF caused to be broadcast on Phoenix area Channel 12 a television advertisement regarding Tom Horne, one of the two candidates for Attorney General. At the time, Horne was still the Superintendent for Public Instruction. The advertisement claimed that (1) when Horne was a state legislator, he had "voted against tougher penalties for statutory rape,"[3] and (2) when Horne was on the Arizona Board of Education, he used his vote to allow "back in the classroom" a teacher who had been caught by students "looking at child pornography on a school computer."[4]

---

[3]          As a state representative in 2000, Horne voted against House Bill 2587, a bill that would in part have raised statutory rape from a class six felony to a class four felony. *See* Sexual Conduct With a Minor, H.R. 2587, 44th Leg. (2nd Reg. Sess. 2000). The bill failed by a 41-12 vote of the Committee of the Whole, due in part to concerns the bill went too far and would punish teens having consensual sex with other teens, such as an 18-year-old in a sexual relationship with a 17-year-old. The majority of the bill's co-sponsors also voted against the bill.

[4]          In 2006, the teacher was recertified by a 6-5 vote of the State Board of Education, four years after he resigned in 2002. The recertification action had been recommended by the education department's Professional

The advertisement urged viewers to "[t]ell Superintendent Horne to protect children, not people who harm them," and displayed photographs of Horne and his office telephone number as Superintendent of Public Instruction.

¶5        On October 21, 2010, Horne filed suit in Maricopa County Superior Court, seeking a temporary restraining order ("TRO") to enjoin CJF and local television stations from airing the advertisement. Based on *Pacion v. Thomas*, 225 Ariz. 168, 236 P.3d 395 (2010), and the exclusive remedy set forth in A.R.S. §§ 16-912(E) and 16-924, the superior court denied Horne's application for a TRO. *See Horne v. Committee for Justice & Fairness*, Maricopa County Cause No. CV 2010-053307 (order dated Oct. 27, 2010).

¶6        Meanwhile, on October 22, 2010, Horne's election committee filed with the Arizona Secretary of State a complaint alleging CJF had engaged in express advocacy and was thus subject to the requirements of A.R.S. § 16-901 et seq. The complaint alleged that, before broadcasting the advertisement, CJF did not register as a political committee but had made expenditures to influence the outcome of the election for Attorney General without complying with Arizona's campaign finance reporting and disclosure requirements.

¶7        On October 25, 2010, the Arizona Secretary of State issued a Reasonable Cause Notice, stating there was reasonable cause to believe CJF had violated A.R.S. §§ 16-902 and 16-912. The Arizona Secretary of State notified the Attorney General of that finding. Horne was ultimately elected Attorney General, and to avoid any conflict of interest, the Arizona Attorney General's Office requested by letter dated January 26, 2011, that MCAO assume enforcement and litigation of the matter.

¶8        On May 23, 2011, MCAO issued an Order Requiring Compliance to CJF pursuant to A.R.S. § 16-924. The order required CJF to do the following: (1) register as a political committee with the Arizona Secretary of State, (2) notify the Secretary of State of CJF's designated

Practices Advisory Committee, which concluded the teacher had demonstrated over the previous four years that he was rehabilitated. The ALJ ultimately found CJF's advertisement contained "inaccurate information" because the reference to the school teacher who had been discovered viewing child pornography was "false." (A previous forensic review of the computer by the Maricopa County Sheriff's Office revealed adult pornography on the teacher's computer, but no child pornography.)

financial institutions, (3) file the required campaign finance reports, (4) provide financial records reflecting the cost of producing the advertisements, (5) comply with the requirements of Arizona's campaign finance laws, and (6) comply with the request for financial records. As permitted in A.R.S. § 16-924(A), CJF requested a hearing, and MCAO forwarded that appeal to the Office of Administrative Hearings for a formal hearing.

¶9 On August 31, 2011, the ALJ held an administrative hearing, and on September 23, he issued a Decision, supported by his findings of fact and conclusions of law. The ALJ determined in part that (1) CJF had made expenditures that expressly advocated against the election of Horne, (2) CJF is a political committee as defined by A.R.S. § 16-901(19), (3) CJF violated A.R.S. § 16-902.01(A) by failing to register as a political committee, (4) CJF was required to file campaign finance reports pursuant to A.R.S. §§ 16-913, -915, and -918, (5) CJF's failure to do so violated A.R.S. § 16-913, and (6) CJF had violated A.R.S. § 16-904(J) by failing to respond to MCAO's request for financial records reflecting the cost for the production of the television advertisement. The ALJ's Decision recommended MCAO's May 23, 2011 Order Requiring Compliance be affirmed and upheld, and CJF be ordered to register as a political committee and comply with the applicable campaign reporting and disclosure requirements. On October 17, 2011, the Maricopa County Attorney issued a Final Decision accepting and adopting the ALJ's findings of fact, conclusions of law, and recommended order.

¶10 CJF filed a complaint in the Maricopa County Superior Court seeking judicial review of the Maricopa County Attorney's October 17 Final Decision accepting and adopting the ALJ's September 23 Decision. *See* A.R.S. §§ 12-124(A), -904(B), -905(A), 16-924(C). After briefing by the parties and oral argument, the superior court took the matter under advisement.

¶11 In a minute entry filed October 11, 2012, the superior court reversed and vacated the recommended order of the ALJ and the Final Decision of the Maricopa County Attorney. The superior court concluded (1) the advertisement "was issue-oriented speech and not 'express advocacy,'" (and thus CJF was not required to register or file financial reports), and (2) "A.R.S. §§ 16-901, -901.01, -902.01, -913, and related statutes are unconstitutional."[5] The court provided no analysis or explanation,

_____

[5] Assuming the superior court's initial ruling can be understood as determining CJF was not subject to the statutory registration and disclosure requirements, the court did not have to further address the constitutionality

5

other than to conclude "the authorities and arguments presented by CJF are well-taken."

¶12        On November 28, 2012, the superior court entered its final judgment in favor of CJF, including an award of costs and attorneys' fees. The final judgment identified only the following provisions of Arizona's campaign finance laws as unconstitutional: (1) the portion of A.R.S. § 16-901.01(A)(1) that includes the phrase "or a campaign slogan or words that in context can have no reasonable meaning other than to advocate the election or defeat  of one or more  clearly identified candidates," (2) A.R.S. § 16-901.01(A)(2)(a), and (3) A.R.S. § 16-901.01(A)(2)(b).[6]

¶13        The Arizona Secretary of State and MCAO filed a timely notice of appeal.  We have jurisdiction pursuant to A.R.S. §§ 12-913 and 12-2101(A)(1).

## ANALYSIS

¶14        In its opening brief, MCAO raises two issues for review: (1) whether CJF qualifies as a political committee that must comply with Arizona's political committee registration and disclosure requirements, and (2) whether Arizona's disclosure requirements are constitutional.

    I.    *Was CJF Required To Comply With Arizona's Political Committee Registration And Disclosure Requirements?*

    A.    *Standard of Review*

¶15        Subsection (C) of A.R.S. § 16-924 makes the Administrative Review Act ("ARA"), *see* A.R.S. §§ 12-901 to -914, applicable here.  As such, we rely on cases under the ARA relating to actions by executive branch

---

of the statutes, and that part of its decision may be considered an advisory ruling.

[6]        The final judgment was submitted by counsel for CJF.  It is not clear from the judgment whether the superior court intended to scale back its previous ruling that "A.R.S. §§ 16-901, -901.01, -902.01, -913, and related statutes are unconstitutional," or whether its final judgment might be construed as a clarification that only the majority of A.R.S. § 16-901.01(A) is unconstitutional, and § 16-901.01(A)'s unconstitutionality effectively invalidates the efficacy of the other statutes.  Ultimately, however, this lack of clarity does not affect our analysis.

agencies. In this case, the superior court's scope of review was circumscribed by A.R.S. § 12-910(E):

> The court may affirm, reverse, modify or vacate and remand the agency action. The court shall affirm the agency action unless after reviewing the administrative record and supplementing evidence presented at the evidentiary hearing the court concludes that the action is not supported by substantial evidence, is contrary to law, is arbitrary and capricious or is an abuse of discretion.

**¶16** Thus, in reviewing an administrative decision, the superior court examines whether the challenged action was illegal, arbitrary, capricious, or involved an abuse of discretion. *See Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436, ¶ 11, 215 P.3d 1114, 1117 (App. 2009); *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Prods., Inc.*, 167 Ariz. 383, 386, 807 P.2d 1119, 1122 (App. 1990). The superior court defers to factual findings supported by substantial evidence, and may not substitute its own judgment where factual questions and substantive expertise are involved. *See Gaveck*, 222 Ariz. at 436, ¶ 11, 215 P.3d at 1117 ("If an agency's decision is supported by the record, substantial evidence exists to support the decision even if the record also supports a different conclusion." (citing *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App. 1984))).

**¶17** On appeal, we determine whether the record contains evidence to support the superior court's judgment, and in so doing, we also reach the underlying question of whether the administrative entity acted in contravention of the law, arbitrarily, capriciously, or in abuse of its discretion. *Saldate v. Montgomery*, 228 Ariz. 495, 498, ¶ 10, 268 P.3d 1152, 1155 (App. 2012); *accord Sanders v. Novick*, 151 Ariz. 606, 608, 729 P.2d 960, 962 (App. 1986). In administrative appeals, neither the superior court nor this court reweighs the evidence. *St. Joseph's Hosp. v. Ariz. Health Care Cost Containment Sys.*, 185 Ariz. 309, 312, 916 P.2d 499, 502 (App. 1996) (citing *Havasu Heights*, 167 Ariz. at 387, 807 P.2d at 1123). Nevertheless, "[w]hether substantial evidence exists is a question of law for our independent determination." *Gaveck*, 222 Ariz. at 436, ¶ 12, 215 P.3d at 1117 (citations omitted). Furthermore, we review *de novo* the legal issues, including those involving statutory interpretation. *Id.*; *Kromko v. City of Tucson*, 202 Ariz. 499, 501, ¶ 4, 47 P.3d 1137, 1139 (App. 2002).

### B. Analysis

**¶18** MCAO argues that CJF qualifies as a political committee that must comply with Arizona's political committee registration and disclosure requirements. We agree.

**¶19** Title 16, Chapter 6, of the Arizona Revised Statutes provides the statutory framework for the regulation of "Campaign Contributions and Expenses" in Arizona. Under A.R.S. § 16-902.01(A), "[e]ach political committee that intends to accept contributions or make expenditures of more than five hundred dollars shall file a statement of organization . . . before accepting contributions [or] making expenditures." Additionally, a political committee making an expenditure for an advertisement expressly advocating the election or defeat of a candidate "shall be registered pursuant to this chapter at the time of distribution [or] placement . . . and shall include on the . . . advertisement the words 'paid for by' followed by the name of the committee that appears on its statement of organization or five hundred dollar exemption statement." A.R.S. § 16-912(A); *see also* A.R.S. § 16-902.01(A) (providing for registration of political committees). If the expenditure for a political committee's advertisement is an independent expenditure, *see infra* ¶ 23, the political committee must also "include on the . . . advertisement the names and telephone numbers of the three political committees making the largest contributions to the political committee making the independent expenditure." A.R.S. § 16-912(B). Other disclosure requirements apply for political committees as well. *See, e.g.*, A.R.S. §§ 16-902 (providing requirements for the organization of political committees); -902.01(B) (listing the required contents of a statement of organization); -902.02 (addressing registration and initial reporting of out-of-state political committees); -904 (providing the duties of a political committee's treasurer); -913 (requiring the filing of campaign finance reports).

**¶20** Under A.R.S. § 16-901(19), a political committee is defined in pertinent part as follows:

> "Political committee" means . . . any association or combination of persons that is organized, conducted or combined *for the purpose of influencing the result of any election* or to determine whether an individual will become a candidate for election in this state . . . *that engages in political activity in behalf of or against a candidate for election* . . . that receives contributions or *makes expenditures* of more than two hundred fifty dollars *in connection therewith*, notwithstanding

that the association or combination of persons may be part of a larger association, combination of persons or sponsoring organization not primarily organized, conducted or combined for the purpose of influencing the result of any election in this state or in any county, city, town or precinct in this state.

(Emphasis added.)[7] Thus, a committee or group organized for the purpose of influencing the result of an election, which engages in political activity for or against a candidate and makes expenditures[8] in connection therewith, qualifies as a political committee subject to registration and disclosure requirements. *See generally Van Riper v. Threadgill*, 183 Ariz. 580, 582-83, 905 P.2d 589, 591-92 (App. 1995).

¶21        In this case, the ALJ found that CJF, whose business office is in Washington, D.C. and primary financial contributor is the Democratic Attorneys General Association ("DAGA") located in Denver, Colorado, is a political organization as defined by the Internal Revenue Code at 26 U.S.C. § 527, and that, in its 2009 Form 90-EZ filed with the Internal Revenue Service, CJF acknowledged, as its "primary exempt purpose," that it operates "for the purpose of accepting donations in order to make disbursements . . . to indirectly influence the selection, nomination, election, or appointment of individuals to state or local public office."[9] The ALJ further found that, at the time of the broadcast, Horne was a Republican candidate for the office of Attorney General, and that CJF spent

---

[7]        In 2012, the legislature amended subsection (19) of the statute by adding the phrase "of more than two hundred fifty dollars." *See* 2012 Ariz. Sess. Laws, ch. 361, § 16 (2nd Reg. Sess.).

[8]        The term "expenditure" includes a payment of money for the purpose of influencing an election in this state. *See* A.R.S. § 16-901(8).

[9]        A political organization that is influencing or attempting to influence the selection, nomination, election, or appointment of an individual to a federal, state, or local public office is tax-exempt on its gross receipts over $25,000 if the organization  registers and files disclosure statements under § 527 of the Internal Revenue Code. *See* 26 U.S.C. § 527.

approximately $1.5 million to produce and broadcast the advertisement in question. The record fully supports the ALJ's factual findings.[10]

¶22      CJF cannot and does not dispute that it is a political organization, or that it spent money to create and disseminate the advertisement in question. Nevertheless, CJF argues, and the ALJ found, that nowhere in the advertisement is there a specific reference to Horne as a candidate, and the advertisement does not mention any other candidate, election, or political party. CJF therefore maintains it should not be required to register as a political committee and comply with the disclosure requirements because its advertisement was merely an "issue-oriented television ad" designed to advocate "for America's middle-class families" and did not qualify as political activity designed to influence the impending election for Attorney General.

¶23      MCAO argues, however, that CJF's advertisement qualifies as an independent expenditure designed to influence the 2010 Attorney General election. An independent expenditure is defined in pertinent part as follows:

> "Independent expenditure" means an *expenditure* by a person or political committee, other than a candidate's campaign committee, *that expressly advocates the election or defeat of a clearly identified candidate*, that is made without cooperation or consultation with any candidate or committee or agent of the candidate and that is not made in concert with or at the request or suggestion of a candidate, or any committee or agent of the candidate.

A.R.S. § 16-901(14) (emphasis added).

¶24      The parties' argument revolves around the "expressly advocates" language of A.R.S. § 16-901(14) and whether the advertisement qualifies as "express advocacy." *See also* A.R.S. § 16-912. If so, CJF concedes it would be subject to the political committee registration and disclosure requirements. As pertinent here, in 2010, A.R.S. § 16-901.01(A) defined the term "expressly advocates" as follows:

---

[10]     Based on these factual findings, the ALJ concluded as a matter of law that "CJF is a political committee, as defined by A.R.S. § 16-901(19)."

A. For purposes of this chapter, "expressly advocates" means:

1. Conveying a communication containing a phrase such as "vote for," "elect," "re-elect," "support," "endorse," "cast your ballot for," "(name of candidate) in (year)," "(name of candidate) for (office)," "vote against," "defeat," "reject," or a campaign slogan or words that in context can have no reasonable meaning other than to advocate the election or defeat of one or more clearly identified candidates, *or*

2. *Making a general public communication, such as in a broadcast medium*, newspaper, magazine, billboard, or direct mailer *referring to one or more clearly identified candidates and targeted to the electorate of that candidate(s)*:

(a) *That in context can have no reasonable meaning other than to advocate the* election or *defeat of the candidate*(s), as evidenced by factors such as the presentation of the candidate(s) in a favorable or unfavorable light, the targeting, placement, or timing of the communication, or the inclusion of statements of the candidate(s) or opponents, *or*

(b) In the sixteen-week period immediately preceding a general election.

A.R.S. § 16-901.01(A) (emphasis added).

**¶25** In this case, CJF's advertisement clearly did not use any of the "magic words" listed in A.R.S. § 16-901.01(A)(1), and MCAO does not appear to argue the advertisement contained a campaign slogan or similar words that would qualify as express advocacy under the remainder of subsection (A)(1).[11] Consequently, the remainder of our analysis focuses on

---

[11] Because it appears subsection (A)(1) of A.R.S. § 16-901.01 is inapplicable to this case, its constitutionality was not properly before the superior court and is not properly before this court. *See Progressive Specialty Ins. Co. v. Farmers Ins. Co. of Ariz.*, 143 Ariz. 547, 548, 694 P.2d 835, 836 (App. 1985) ("It is not an appellate court's function to declare principles of law which cannot have any practical effect in settling the rights of litigants." (citation omitted)). As a matter of judicial restraint, courts should not give advisory opinions. *See Home Builders Ass'n of Cent. Ariz. v. Kard*, 219 Ariz. 374, 377, ¶ 9, 199 P.3d 629, 632 (App. 2008). Accordingly, we vacate as

whether CJF's advertisement qualifies as express advocacy under subsection (2) of A.R.S. § 16-901.01(A). We turn first to the question of whether CJF's advertisement qualifies as express advocacy under subpart (a) of A.R.S. § 16-901.01(A)(2).

¶26 In his conclusions of law, the ALJ concluded that "CJF's advertisement constituted express advocacy pursuant to A.R.S. § 16-901.01(A)(2)." Although not bound by the ALJ's legal conclusion, we nevertheless agree with his conclusion and note the factual findings underpinning his reasoning are supported by substantial evidence. As the ALJ recognized:

> The advertisement referred by name to Tom Horne, who was by that time clearly identified as the Republican candidate for Attorney General. It was aired on Channel 12, which broadcasts in the greater Phoenix metropolitan area and beyond, and thus may be presumed to have targeted the electorate for such a statewide office. Although the advertisement only referred to Tom Horne in his then[-] position of Superintendent of Public Instruction and called upon viewers to contact him at his office in the Department of Education, the only reasonable purpose for running an advertisement, during an election campaign, which cost approximately $1.5 million to produce and broadcast, to critique Tom Horne's past actions as a former member of the

---

inapplicable that portion of the superior court's judgment finding unconstitutional the portion of A.R.S. § 16-901.01(A)(1) containing the phrase "or a campaign slogan or words that in context can have no reasonable meaning other than to advocate the election or defeat of one or more clearly identified candidates." We also note the superior court's ruling with respect to that provision is in conflict with this court's previous opinion in *Kromko*. *See* 202 Ariz. at 502-03, ¶¶ 9-10, 47 P.3d at 1140-41. Moreover, language nearly identical to that codified in subsection (A)(1) has been examined with approval by federal courts. *See, e.g., Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 793-94 (10th Cir. 2013) (stating that the language of 11 C.F.R. § 100.22(a) is consistent with the Supreme Court's guidance in *Buckley v. Valeo*, 424 U.S. 1, 44 (1976)), *cert. denied*, 134 S. Ct. 2288 (2014); *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 190-94 (2003) (recognizing "the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad"), *overruled in part on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

legislature and as an occupant of a post he would soon vacate,
was to advocate his defeat as candidate for Attorney General.

¶27 These facts meet the test for express advocacy under A.R.S. § 16-901.01(A)(2)(a). The broadcast medium utilized by CJF for its public communication, Phoenix television Channel 12, which broadcasts in the greater Phoenix metropolitan area and beyond, clearly targeted a major portion of the electorate for the statewide office of Attorney General, and it did so within days of the election. In fact, nothing in the record indicates it would have been possible to more narrowly target such a significant portion of the electorate for that office.

¶28 Further, although CJF argues Horne was not a "clearly identified candidate" because the advertisement did not specifically identify him as a candidate for Attorney General, no question exists that Horne was in fact a "clearly identified candidate" as defined under Arizona's statutory scheme. "'Clearly identified candidate' means that the name, a photograph or a drawing of the candidate appears or the identity of the candidate is otherwise apparent by unambiguous reference." A.R.S. § 16-901(4). *Accord* 11 C.F.R. § 100.17. In the advertisement promulgated by CJF, Horne was identified through his name, photographs, and his prior and then-current public offices. Moreover, by the time the advertisement was run, Horne had been clearly identified to the general populace as the Republican candidate for Attorney General. It was unnecessary for the advertisement to further identify the position he sought.

¶29 Finally, as the ALJ noted, the advertisement criticized Horne's past actions both as a former member of the legislature and as the Superintendent for Public Instruction, a position he would soon vacate. Contrary to CJF's argument that the advertisement "addressed the important issue of protecting Arizona['s] schoolchildren from statutory rape and from teachers who view pornographic materials in the classroom," the only reasonable purpose for running such an advertisement immediately before the election was to advocate Horne's defeat as candidate for Attorney General.

¶30 In sum, CJF as a political organization made a general public communication in a broadcast medium referring to a clearly identified candidate and targeted to the electorate of that candidate, that in context could have no reasonable meaning other than to advocate the defeat of that candidate, as evidenced by factors such as the presentation of the candidate in an unfavorable light and the targeting, placement, and timing of the communication. In this case, reasonable minds could not differ as to

whether CJF's advertisement encouraged a vote against Horne.[12] As a result, CJF's advertisement was express advocacy as statutorily defined in A.R.S. § 16-901.01(A)(2)(a).[13] Therefore, under Arizona's statutes, CJF was a political committee that made independent expenditures and was required to comply with Arizona's political committee registration and campaign contribution disclosure laws.

## II. Are Arizona's Disclosure Requirements Constitutional?

¶31 MCAO next argues the superior court erred in concluding that A.R.S. § 16-901.01(A)(2)(a) and Arizona's registration and disclosure requirements, which closely parallel federal law, are unconstitutional. CJF maintains Arizona's definition of express advocacy under A.R.S. § 16-901.01(A)(2)(a) is unconstitutional, and challenges its status as a political committee and the resulting political committee registration and campaign contribution disclosure requirements. We agree with MCAO.

---

[12] *See generally Citizens United*, 558 U.S. at 326 ("[T]here is no reasonable interpretation of [the film] *Hillary* other than as an appeal to vote against Senator Clinton."); *Fed. Election Comm'n v. Furgatch*, 807 F.2d 857, 864-65 (9th Cir. 1987) ("There is vagueness in Furgatch's message, but no ambiguity."); *but see Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1098 (9th Cir. 2003) ("[A] close reading of *Furgatch* indicates that we presumed express advocacy must contain some explicit *words* of advocacy."); *Kromko*, 202 Ariz. at 502-03, ¶¶ 10-11, 47 P.3d at 1140-41 (adopting in part *Furgatch*, but appearing to limit its holding in light of criticism of *Furgatch*).

[13] Because we hold that CJF's advertisement qualifies as express advocacy under subpart (a) of A.R.S. § 16-901.01(A)(2), we need not and do not analyze whether the advertisement qualifies as express advocacy under subpart (b) of the statute. Although the superior court's final judgment found unconstitutional both subparts (a) and (b) of A.R.S. § 16-901.01(A)(2), the legislature repealed subpart (b) (and also made insignificant amendments to subsection (A)(1)) before the court issued its final judgment. *See* 2012 Ariz. Sess. Laws, ch. 257, § 1 (2nd Reg. Sess.). The superior court's ruling as to the constitutionality of subpart (b) was merely an advisory ruling on a repealed subsection of the statute; consequently, we vacate that portion of the superior court's judgment and do not further analyze subpart (b)'s constitutionality. *See Home Builders Ass'n*, 219 Ariz. at 377, ¶ 9, 199 P.3d at 632; *Progressive Specialty Ins. Co.*, 143 Ariz. at 548, 694 P.2d at 836.

### A.    Standard of Review – Exacting Scrutiny

¶**32**    The parties disagree as to the standard of review this court should employ in analyzing the statutes at issue, either "strict scrutiny" or a less stringent "exacting scrutiny" standard. Citing *Federal Election Commission v. Wisconsin Right to Life, Inc. ("WRTL")*, CJF argues it was involved in issue advocacy, and the strict scrutiny standard must be applied to any statute attempting to regulate or prohibit such speech. *See* 551 U.S. 449, 464 (2007) ("Because [the statute] burdens political speech, it is subject to strict scrutiny.").[14] Under strict scrutiny, the government must prove that applying the challenged statutes to CJF's advertisement "furthers a compelling interest and is narrowly tailored to that interest." *Id*. (citation omitted).

¶**33**    In this case, however, because A.R.S. § 16-901.01(A)(2)(a) and the statutes related to it ultimately implicate only disclosure requirements, we apply the exacting scrutiny standard. *See Free Speech*, 720 F.3d at 792-93; *see also N.M. Youth Org. v. Herrera*, 611 F.3d 669, 676 (10th Cir. 2010) (indicating a challenge to regulations defining a political committee is a challenge to disclosure regulations). Although disclaimer and disclosure requirements may burden the ability to speak, they "impose no ceiling on campaign-related activities," and "do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (quoting *Buckley*, 424 U.S. at 64; *McConnell*, 540 U.S. at 201). The Supreme Court subjects disclosure and disclaimer requirements to exacting scrutiny, which requires the government to demonstrate "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 558 U.S. at 366-67 (citing *Buckley*, 424 U.S. at 64, 66; *McConnell*, 540 U.S. at 231-32); *accord Real Truth About Abortion ("RTAA") v. Fed. Election Comm'n*, 681 F.3d 544, 549 (4th Cir. 2012) ("[A]n intermediate level of scrutiny known as 'exacting scrutiny' is the appropriate standard to apply in reviewing provisions that impose disclosure requirements, such as the regulation and policy." (citations omitted)), *cert. denied*, 133 S. Ct. 841 (2013); *Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010) (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010)), *cert. denied*, 131 S. Ct. 1477 (2011).

---

[14]    *WRTL* applied the strict scrutiny standard when examining the constitutionality of § 203 of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), 2 U.S.C. § 441b(b)(2) (2000 ed., Supp. IV), as applied to specific issue-oriented ads, which the Court held were not the functional equivalent of express advocacy. *See* 551 U.S. at 455-57, 464-65, 476-77. *WRTL* does not, however, support CJF's premise that CJF's advertisement was solely issue advocacy. *See id*. at 455-76.

**¶34** Moreover, CJF's reference to *Citizens United* for its argument in favor of the application of strict scrutiny is misplaced. *See RTAA*, 681 F.3d at 549. CJF notes the *Citizens United* majority's reference to "onerous restrictions" on political action committee speech, which would ordinarily be subject to strict scrutiny, *see* 558 U.S. at 337-40, and argues that Arizona's statutory scheme is similar to the one in *Citizens United*. As the Fourth Circuit Court of Appeals has recognized, however, the Supreme Court in *Citizens United* "distinguished its application of the strict scrutiny standard to expenditure restrictions from the exacting scrutiny standard applicable to disclosure requirement provisions." *RTAA*, 681 F.3d at 549. The statutes at issue in this case do not prevent anyone from speaking or impose ceilings on campaign-related activities. *See RTAA*, 681 F.3d at 554 ("In contrast, [the regulation] *does not restrain speech*; it only implicates *the requirement for disclosing* specified information." (emphasis in original)). Accordingly, we apply exacting scrutiny to determine whether the statutes implicating Arizona's registration and disclosure requirements are constitutional.

### B. A.R.S. § 16-901.01(A)(2)(a) and Disclosure Requirements

**¶35** CJF challenges on an as-applied and facial basis the constitutionality of A.R.S. § 16-901.01(A)(2)(a) under the United States and Arizona constitutions.[15] CJF maintains subpart (a) of § 16-901.01(A)(2) is both overbroad and vague, and impermissibly chills speech.[16] We disagree.

---

[15] Both the First Amendment to the United States Constitution and Article 2, Section 6, of the Arizona Constitution protect speech from government abridgment. The First Amendment restrains government interference with speech rights, whereas the Arizona Constitution guarantees each individual's right to speak freely. *State v. Stummer*, 219 Ariz. 137, 142, ¶ 14, 194 P.3d 1043, 1048 (2008). Although noting that our supreme court has stated "Article 2, Section 6 has 'greater scope than the first amendment,'" *id*. at 143, ¶ 17, 194 P.3d at 1049 (quoting *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 354, 773 P.2d 455, 459 (1989)), CJF provides no argument that our analysis of the issues presented here under the Arizona Constitution should differ from that used by courts under the United States Constitution.

[16] A law is facially overbroad under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*,

### 1.     Overbreadth

**¶36**     Relying on *Colorado Ethics Watch ("CEW") v. Senate Majority Fund, LLC*, 269 P.3d 1248 (Colo. 2012), CJF suggests express advocacy cannot permissibly extend beyond the *Buckley* "magic words" or substantially similar synonyms, as codified in subsection (A)(1) of A.R.S. § 16-901.01. *See CEW*, 269 P.3d at 1255-57. Recent Supreme Court and federal appellate court decisions, however, have upheld an approach to defining express advocacy not only in terms of *Buckley*'s "magic words" and substantially similar synonyms as recognized in subsection (A)(1), but also their "functional equivalent," as provided in subpart (a) of subsection (A)(2). *See Free Speech*, 720 F.3d at 794 (citing *RTAA*, 681 F.3d at 550).

**¶37**     In *McConnell*, the Supreme Court considered a facial overbreadth challenge to Title II, § 201, of the BCRA, which included a provision defining express advocacy for purposes of electioneering communications. 540 U.S. at 190-91. In rejecting the challenge, the Court noted *Buckley*'s narrow construction of the Federal Election Campaign Act of 1971 to require express advocacy "was a function of the vagueness of the [original] statutory definition of 'expenditure,' not an absolute First Amendment imperative." *Free Speech*, 720 F.3d at 794 (bracketed portion omitted from original) (quoting *RTAA*, 681 F.3d at 550 (citing *McConnell*, 540 U.S. at 191–92)). Consequently, the Court held "Congress could permissibly regulate not only communications containing the 'magic words' of *Buckley*, but also communications that were 'the functional equivalent' of express advocacy." *Id.* at 795 (quoting *RTAA*, 681 F.3d at 550-51 (citing *McConnell*, 540 U.S. at 193)).[17]

---

559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

[17]     In his dissent in *McConnell*, Justice Thomas noted that the majority opinion "overturned" all Court of Appeals decisions that had interpreted *Buckley* as creating a constitutionally mandated line, and the only express advocacy decision *McConnell* possibly did not cast into doubt was *Furgatch*. 540 U.S. at 278 n.11 (Thomas, J., dissenting). *Furgatch* rejected *Buckley*'s "magic words" test, and inspired the federal test for express advocacy codified at 11 C.F.R. § 100.22(b). Paul S. Ryan, *Wisconsin Right to Life and the Resurrection of Furgatch*, 19 Stan. L. & Pol'y Rev. 130, 140, 159 (2008) (surmising that "the 11 C.F.R. § 100.22(b) *Furgatch*-like standard for defining express advocacy is on solid legal ground" after *WRTL*).

¶**38**          In *WRTL*, the Court adopted a "functional equivalent" test. *See Free Speech*, 720 F.3d at 795 (citing *WRTL*, 551 U.S. at 474 n.7; *RTAA*, 681 F.3d at 552).  The Court's controlling opinion held "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL*, 551 U.S. at 469–70.  This test closely correlates to the test set forth in A.R.S. § 16-901.01(A)(2)(a), which provides that a communication "expressly advocates" if it "can have no reasonable meaning other than to advocate the election or defeat of the candidate(s)."  *See Free Speech*, 720 F.3d at 795 (comparing the *WRTL* test to 11 C.F.R. § 100.22(b), which provides that a communication expressly advocates if it "could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s)").  The test provided in A.R.S. § 16-901.01(A)(2)(a) is certainly no broader than *WRTL*'s functional equivalent test.  *See id.*; *see also RTAA*, 681 F.3d at 552 (refuting a vagueness challenge to 11 C.F.R. § 100.22(b)).

¶**39**          *Citizens United* reaffirmed the *WRTL* functional equivalent test's constitutionality and provided further support for the use of such a test to define express advocacy.  *See Free Speech*, 720 F.3d at 795.  In *Citizens United,* the Supreme Court applied the *WRTL* test to determine whether the communication at issue (a film released by Citizens United entitled *Hillary: The Movie*) would be prohibited by the corporate funding restrictions set forth in Title II of the BCRA.  558 U.S. at 324-26.  The Court ultimately concluded that, "[u]nder the standard stated in *McConnell* and further elaborated in *WRTL*, the film qualifies as the functional equivalent of express advocacy."  *Id.* at 326.  The Court also upheld federal disclaimer and disclosure requirements applicable to "electioneering communications," *id.* at 366-72, while "reject[ing] Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy."  *Id.* at 369.  Thus, in addressing the permissible scope of disclosure requirements, the Court not only rejected the "magic words" standard urged here by CJF, but also found "disclosure requirements could extend beyond speech that is the 'functional equivalent of express advocacy' to address even ads that 'only pertain to a commercial transaction.'"  *Free Speech*, 720 F.3d at 795 (quoting *Citizens United*, 558 U.S. at 369).  Contrary to CJF's assertions, *Citizens United* supports the use of a functional equivalent test in defining "express advocacy."  *See id.*; *RTAA*, 681 F.3d at 551.  "If mandatory disclosure requirements are permissible when applied to ads that merely *mention* a [] candidate, then applying the same burden to ads that go further and are the functional equivalent of express advocacy cannot automatically be

impermissible." *RTAA*, 681 F.3d at 552 (emphasis in original), *quoted in Free Speech*, 720 F.3d at 795. As a result, *Citizens United* directly contradicts CJF's argument that the definition of express advocacy set forth in subpart (a) of A.R.S. § 16-901.01(A)(2) is overly broad with respect to disclosure requirements.

¶40         CJF's reliance on *Federal Election Commission v. Massachusetts Citizens for Life, Inc. ("MCFL")*, 479 U.S. 238 (1986), is also unavailing. In *MCFL*, the Supreme Court held that a section of the Federal Election Campaign Act prohibiting direct expenditure of corporate funds in connection with any federal election violated the First Amendment as applied to a nonprofit corporation that published a newsletter urging readers to vote "pro-life" and listing approximately 400 candidates for state and federal office in Massachusetts who either supported or opposed the corporation's views. *Id.* at 241-45, 263-65. CJF speculates the position advocated by MCAO in this case (treating CJF's advertisement as express advocacy subject to Arizona's disclosure requirements) could force issue advocacy groups such as MCFL to register as political committees and be subject to Arizona's disclosure requirements by treating their communications as express advocacy.

¶41         *MCFL* involved whether a nonprofit advocacy group that was engaged in express advocacy could raise and spend general fund money directly on an election. *Id.* at 249-65. Thus, it was a case challenging a restriction on independent spending as applied to MCFL, *see id.* at 263-64, not a case directly challenging the constitutionality of disclosure laws, and we see no reason to speculate on the potential overbreadth of A.R.S. § 16-901.01(A)(2)(a) on an as-applied basis to groups other than CJF. Moreover, to the extent the issue is properly before us, A.R.S. § 16-901.01(B) would appear to address a situation such as that posed by CJF:

> A communication within the scope of subsection A, paragraph 2 shall not be considered as one that expressly advocates merely because it presents information about the voting record or position on a campaign issue of three or more candidates, so long as it is not made in coordination with a candidate, political party, agent of the candidate or party or a

person who is coordinating with a candidate or candidate's agent.[18]

¶42　　　Consequently, under A.R.S. § 16-901.01(B), a group such as MCFL, which is engaged in independent communications about the voting record or position on a campaign issue of three or more candidates, is not necessarily considered to be one that expressly advocates, even if its communication falls within the scope of A.R.S. § 16-901.01(A)(2).

## 2.　　Vagueness

¶43　　　We also reject CJF's argument that A.R.S. § 16-901.01(A)(2)(a) is impermissibly vague. As the Fourth Circuit noted when considering the propriety of 11 C.F.R. § 100.22(b), "cases that fall close to the line will inevitably arise when applying [the statute]. This kind of difficulty is simply inherent in any kind of standards-based test." *RTAA*, 681 F.3d at 554 (citing *United States v. Williams*, 553 U.S. 285, 306 (2008) ("Close cases can be imagined under virtually any statute. The problem that poses is [not] addressed . . . by the doctrine of vagueness . . . ."); *United States v. Wurzbach*, 280 U.S. 396, 399 (1930) ("Wherever the law draws a line there will be cases very near each other on opposite sides.")); *accord Nat'l Org. for Marriage, Inc. v. Roberts*, 753 F. Supp. 2d 1217, 1221 (N.D. Fla. 2010) ("The fact that 'it may be difficult in some cases to determine whether these clear requirements have been met' does not mean that the statute is void for vagueness." (quoting *Williams*, 553 U.S. at 306)).

¶44　　　Additionally, the mere fact that A.R.S. § 16-901.01(A)(2)(a) identifies certain factors for consideration, most specifically the "timing of the communication," does not mean it is inconsistent with *WRTL*. *See RTAA*, 681 F.3d at 554 (examining 11 C.F.R. § 100.22(b)'s "proximity to the election" language in light of *WRTL*). *WRTL* "simply held that the timing of speech cannot be used as a proxy for a speaker's intent." *Id.* (citing *WRTL*, 551 U.S. at 472 ("To the extent th[e] evidence [regarding the timing of WRTL's ads] goes to WRTL's subjective intent, it is again irrelevant.")). Under both *WRTL* and subpart (a) of § 16-901.01(A)(2), subjective intent is not a consideration, and as the Supreme Court noted in *WRTL*, by virtue of their time-sensitive statutory definition, "[e]*very* ad covered by [the electioneering communication regulation] will . . . air just before a primary or general election." *Id.* (citing *WRTL*, 551 U.S. at 472 (emphasis in

---

18　　In 2012, the legislature amended subsection (B) of A.R.S. § 16-901.01. *See* 2012 Ariz. Sess. Laws, ch. 257, § 1 (2nd Reg. Sess.). We quote the current version of the statute, as the amendments are immaterial to our analysis.

original)).  Consequently, although "considering timing with respect to electioneering communications would prove redundant, a limited reference to whether, for example, an ad airs in an election year, would actually help limit the number of communications that are considered independent expenditures."  *Id.*  The same is true regarding A.R.S. § 16-901.01(A)(2)(a).

### 3.  *Potential Chilling Effect*

**¶45**　　　　CJF maintains that the possibility citizens or groups might have to register as a political committee and disclose their largest donors could have an impermissible chilling effect on speech.  Although the potential exists for disclosure requirements to have an unconstitutional chilling effect on speech if a "reasonable probability" exists an organization or its members may face threats, harassment, or reprisals due to disclosure, *see McConnell*, 540 U.S. at 197-98; *Citizens United*, 558 U.S. at 370, CJF has identified no instance of harassment or retaliation involving CJF or its donors, despite the fact that CJF discloses contributor information through reports filed with the Internal Revenue Service.  Additionally, CJF has not presented evidence that it was unfairly targeted by MCAO, or that MCAO or the ALJ had an inherent bias against CJF.[19]

**¶46**　　　　CJF also notes that violations of Arizona's disclosure laws may result in civil or even criminal penalties.  *See generally* A.R.S. §§ 16-904(K), -919(D)-(E), -924(B).  CJF points to no evidence that any potential penalties have chilled its speech.  It appears the statutes implicated in this

---

[19]　　　CJF speculates that § 16-901.01(A)(2)(a) has been "unfairly and unconstitutionally applied to CJF because . . . MCAO and the ALJ's specific reference to CJF's largest contributor (DAGA) demonstrates an inherent bias and presumption that any group funded by Democrats must necessarily be engaging in express advocacy for the defeat of a Republican." The ALJ's finding that CJF's primary financial contributor is the Democratic Attorneys General Association was one of many findings of fact made by the ALJ.  At most, the finding lent support to the ALJ's conclusion that "CJF is a political committee, as defined by A.R.S. § 16-901(19), because of its stated purpose 'of accepting donations in order to make disbursements . . . to indirectly influence the selection, nomination, election, or appointment of individuals to state or local public office.'"  We disagree that the ALJ's finding demonstrated an inherent bias against CJF on the part of either MCAO or the ALJ or in any way infringed on CJF's ability to speak.

case only involve civil penalties, and much of any speculative chilling effect is addressed by our analysis finding § 16-901.01(A)(2)(a) is neither overbroad nor vague.[20]

¶47      In sum, CJF has failed to show Arizona's disclosure laws are unconstitutional as applied to CJF or that any, much less a substantial number, of the applications of the disclosure laws are unconstitutional. *See Stevens*, 559 U.S. at 473; *see also Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 470 n.1 (7th Cir. 2012) (recognizing numerous decisions by federal courts of appeals upholding federal and state disclosure regulations against facial attacks), *aff'g* 735 F. Supp. 2d 994 (N.D. Ill. 2010).  Accordingly, we find no constitutional infirmity in Arizona's disclosure requirements, including A.R.S. § 16-901.01(A)(2)(a), both facially and as applied to CJF.

### 4.      *Purpose of Disclosure*

¶48      The purpose of a registration requirement is to ensure disclosure. *See, e.g., Madigan*, 735 F. Supp. 2d at 1000 (equating "election-law disclosure requirements" discussed in *Citizens United* with "registration requirements, including related reporting, recordkeeping, and disclosure requirements").  Disclosure serves "substantial governmental interests," including (1) providing voters with information to aid them in evaluating candidates and the sources of a candidate's support, (2) deterring actual corruption and avoiding the appearance of corruption by exposing large contributions and expenditures to public light, and (3) providing a means of gathering the data necessary to detect violators. *Buckley*, 424 U.S. at 67-68; *accord McConnell*, 540 U.S. at 196 (acknowledging *Buckley* and recognizing the "important state interests" served by disclosure, including "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions"); *Citizens United*, 558 U.S. at 371 ("The First Amendment protects political speech; and disclosure permits citizens . . . to react to the speech . . . in a proper way.  This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."); *see also Human Life of Washington*, 624 F.3d at 1005-06 (recognizing the "vital provision of information" to voters through disclosure laws "repeatedly has been recognized as a sufficiently important, if not compelling, governmental interest").  The requirement of disclosure in this case is

---

[20]      We also note that a party such as CJF can request assistance from the Secretary of State in complying with its reporting requirements.

substantially related to a sufficiently important governmental interest. *See Citizens United*, 558 U.S. at 366.

### III.   Attorneys' Fees

**¶49**        Citing A.R.S. §§ 12-348 and 12-349, CJF requests an award of its costs and attorneys' fees associated with the preparation of its answering briefs in response to the MCAO and amicus curiae brief of the Citizens Clean Elections Commission ("CCEC").  CJF is not the prevailing party, and the positions set forth in the briefs of MCAO and CCEC were reasonable; accordingly, CJF's request is denied.

## CONCLUSION

**¶50**        We vacate the portion of the superior court's judgment holding unconstitutional A.R.S. § 16-901.01(A)(1) and now-repealed subpart (b) of § 16-901.01(A)(2) , and reverse the remainder of the superior court's judgment, including its award of costs and attorneys' fees to CJF. Further, we reinstate the Final Decision of the Maricopa County Attorney requiring CJF to register as a political committee and comply with the reporting requirements of Arizona's campaign finance laws.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh