IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

BENEVOLENT AND PROTECTIVE ORDER OF ELKS #2656,
*Plaintiff/Appellant*,

*v.*

STATE OF ARIZONA DEPARTMENT OF LIQUOR LICENSES AND
CONTROL, *Defendant/Appellee*.

No. 1 CA-CV 14-0793
FILED 1-21-2016

---

Appeal from the Superior Court in Maricopa County
No. LC2014-000104-001
The Honorable Crane McClennen, Judge

**AFFIRMED**

---

COUNSEL

Charles E. Buri, PLC, Phoenix
By Charles E. Buri
*Co-Counsel for Plaintiff/Appellant*

and

Guttilla Murphy Anderson PC, Phoenix
By Nicholas C. Guttilla
*Co-Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Michael Raine
*Counsel for Defendant/Appellee*

---

**OPINION**

---

Judge Andrew W. Gould delivered the opinion of the Court, in which Presiding Judge Donn Kessler and Judge Patricia K. Norris joined.

---

**G O U L D**, Judge:

¶1        The Benevolent Order of the Elks (the "Elks") appeals the superior court's judgment affirming the decision by the Arizona Department of Liquor Licenses and Control ("Department"). In its decision, the Department fined the Elks $200 for conducting unlawful gambling activities in violation of Arizona Revised Statutes ("A.R.S.") section 4-244(26). For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        The Elks is an Arizona non-profit organization licensed to sell liquor by the Department. In 2010, the Elks entered into a contract with Patriots Land Group ("Patriots") to run a "sweepstakes," for the stated purpose of charitable fundraising. Pursuant to the contract, the Elks leased computer equipment, software, and furniture from Patriots to conduct the sweepstakes. The sweepstakes equipment consisted of a kiosk, which housed a file server connected to a game terminal; each game terminal had a video monitor, a mouse, and a magnetic card reader. In addition, Patriots agreed to provide operational support consisting of training, computer/equipment maintenance and repairs, and software updates.

¶3        In April 2010 the Elks started offering the sweepstakes to its members. The sweepstakes kiosks were housed in the Elks' Lodge and were available for use during the Elks' hours of operation. To participate in the sweepstakes, a member obtained a player card, provided by Patriots, from the Elks' bar manager or bartender. Each card had a magnetic strip and a sweepstakes identification number on the back.

¶4        Once a member received a sweepstakes card, he participated in the sweepstakes by running the card through the kiosk's card reader and placing money in the kiosk's bill acceptor. Members paid one dollar for each play.

¶5        The software provided by Patriots generated "prize pools" consisting of cash prizes. The pools were funded by the money members

paid to purchase plays. Each play included the chance to win cash prizes of up to $1,199.

¶6 If a member won, the software added the prize amount to his card. When a member wished to redeem his winnings, he would print out a redemption ticket from the kiosk, give the ticket to the bar manager or bartender, and receive a cash payout. The Elks maintained a daily bank of $500 to redeem winnings.

¶7 Members were not required to pay for all of their plays. Members could receive one free play a day. However, over the course of the Elks sweepstakes, only nine to ten percent of the sweepstakes plays were free plays.

¶8 Members could also obtain free plays by mailing a request, with a self-addressed stamped envelope, to Patriots. There was no limit on the number of mail-in requests that could be submitted by a member. Patriots, however, never received any mail-in requests for free plays.

¶9 For each play, members could learn if they won in two ways. The member could click the "reveal button" on the kiosk's video monitor, which would instantly reveal if the member won a cash prize. In the alternative, a member could run his sweepstakes card through a game terminal's card reader, and play a casino style computer game; at the end of the game, the monitor would reveal any winnings. However, whether the member used the reveal button or played the casino game, the method used had no bearing on the outcome, because the prize amount, if any, was assigned to each play as it was loaded onto the sweepstakes card.

¶10 Under the contract, Patriots received 55% of the revenue generated by the kiosks, paid every two weeks, and a one-time set-up fee of $1,250.00. Patriots required the Elks to connect its equipment to the internet to enable Patriots to monitor the money paid for sweepstakes plays, cash prizes, and free plays.

¶11 Patriots also provided the Elks with rules and regulations for conducting the sweepstakes. These rules were posted by all of Patriot's kiosks, and stated that sweepstakes participants must be members of the Elks; the rules also stated how many free plays were allotted to each member. Finally, the contract required the Elks to assist Patriots with any litigation or lobbying efforts regarding the legality of the sweepstakes in Arizona.

¶12 In June 2012, the Department began investigating the Elks after receiving a complaint from another Elks Lodge. During the investigation, the Department discovered that between April 2011 and June 2012, a total of $234,408.00 was paid by members to participate in the sweepstakes. About 55%, or $128,834.25, was paid out to the members as prizes. The remaining 45% was split between Patriots and Elks; Patriots received 55%, or $58,065.56, and the Elks kept the remaining 45%, or $47,508.19.

¶13 After its investigation, the Department concluded the sweepstakes constituted unlawful gambling in violation of A.R.S. § 4-244 (26),[1] which provides that "[i]t is unlawful . . . [f]or a [liquor] licensee or employee to knowingly permit unlawful gambling on [its] premises." The Department instructed the Elks to cease and desist operating the kiosks. The Elks immediately complied.

¶14 The Elks timely requested an evidentiary hearing with an Administrative Law Judge. After a two-day hearing, the ALJ determined the sweepstakes constituted illegal gambling. However, rather than suspend or revoke the Elks' liquor license, the ALJ imposed a minimum fine of $200. *See* A.R.S. § 4-210(A)(9) (stating the Department has the authority to suspend or revoke a liquor license for any violation of Title 4); A.R.S. § 4-210.01(A) (fines for violations of Title 4 may range from a maximum fine of $3,000 to a minimum fine of $200).

¶15 The Elks unsuccessfully appealed the ALJ's decision to both the Director of the Department and the Department. After exhausting its administrative remedies, the Elks appealed the Department's decision to the superior court, which affirmed the Department's decision. The Elks timely appealed the superior court's judgment to this Court.

## DISCUSSION

¶16 "On appeal, we determine whether the record contains evidence to support the superior court's judgment, and in so doing, we also reach the underlying question of whether" the Department "acted in contravention of the law, arbitrarily, capriciously, or in abuse of its discretion." *Comm. for Justice & Fairness v. Ariz. Sec'y of State's Office*, 235 Ariz. 347, 351, ¶ 17 (App. 2014). We view the evidence in the light most

---

[1] We refer to the current versions of all statutes unless stated otherwise.

favorable to upholding the Department's decision, and review questions of law de novo. *Baca v. Ariz. Dep't. of Econ. Sec.*, 191 Ariz. 43, 45-46 (App. 1998).

## I.  Gambling

**¶17**　　The Elks argue the sweepstakes do not constitute illegal gambling.  Rather, the Elks contend the sweepstakes is a "marketing tool used to promote" charitable donations, and plays which are purchased are "given to members as tokens of appreciation for their donations."  We disagree.

**¶18**　　Gambling is defined under A.R.S. § 13-3301(4) as ". . . risking or giving something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event . . . ."  Thus, unlawful gambling consists of three elements: (1) the payment of consideration, (2) for the chance, (3) to win a prize or obtain some benefit. A.R.S. § 13-3301(4).

**¶19**　　The Elks do not contest the fact the sweepstakes plays involve the chance to win a cash prize.  Rather, they argue that because free plays are available to members, the sweepstakes lack the requisite element of consideration.  In making this argument, the Elks seek to compare the sweepstakes to cases involving radio and TV promotional giveaways, grocery store giveaways, and sweepstakes entries included with the purchase of goods or services. *See Fed. Commc'n Comm'n v. Am. Broad. Co.*, 347 U.S. 284, 296 (1954) (radio and television programs giving away prizes were not conducting an illegal lottery because contestants were not required to purchase anything or pay any consideration to enter the contest); *Brice v. State*, 242 S.W.2d 433, 435 (Tex. 1951) (prize drawing was not an illegal lottery because there was no consideration; contestants paid nothing to enter the contest, were not required to purchase any goods or services, and were not required to be in attendance at the store at the time of the drawing); *see also Miss. Gaming Comm'n v. Treasured Arts, Inc.*, 699 So. 2d 936, 940-41 (Miss. 1997) (business selling telephone calling cards, with purchases including a free sweepstakes entry, was not engaged in illegal gambling; contestants paid retail value for the calling cards, and no additional consideration was paid for sweepstakes entries).

**¶20**　　The cases cited by the Elks are distinguishable.  Here, 90% of the sweepstakes plays involved members paying money for a chance to win cash prizes.  Additionally, the members received no goods or services in return for their purchases.

¶21 The Elks' attempt to characterize the plays as "free," or as charitable "donations" is also unavailing. Several courts have rejected similar arguments. For example, in *Cleveland v. Thorne*, 987 N.E. 2d 731 (Ohio App. 2013), a business attempted to implement a sweepstakes through the sale of internet time. For every dollar spent to purchase internet time, a customer received 100 sweepstakes points. *Cleveland*, 987 N.E.2d at 735, ¶ 2. Most customers, however, did not use the internet time, and were paying primarily for the sweepstakes entries. *Id.* at 743, ¶¶ 42-44. Under these circumstances, the court held the business attempted "to couch [its] illegal activities as [a] legitimate business enterprise" and although the customers were technically buying internet time, the jury was justified in finding the customers' primary purpose was to participate in the sweepstakes. *Id.* at 744-45, ¶¶ 44, 48.

¶22 Similarly, in *Commonwealth v. Wintel, Inc.*, 829 A.2d 753 (Pa. Comm. Ct. 2003), a business offered a "Freespin Promotional Sweepstakes System," consisting of video slot machines, for the alleged purpose of raising money for charitable purposes. *Id.* at 755. The business provided participants with two daily free plays and the opportunity to purchase additional plays. *Id.* Despite the existence of daily free plays and a charitable motive, the court determined that because participants paid money to play the machines, the machines were being used for illegal gambling. *Id.* at 758. *See Barber v. Jefferson Cty. Racing Ass'n Inc.*, 960 So. 2d 599, 610-11, 615 (Ala. 2006) (the court rejected the argument that free plays negated the requisite element of consideration for gambling, stating that the devices in question were "slot machines as to those who pay to play them" and that "[g]ratuitous entries . . . do not legitimize the [activity] any more than some opportunity for free plays could render innocuous a conventional slot machine.").

¶23 The evidence in this case supports the Department's determination that the Elks' sweepstakes is gambling under A.R.S. § 13-3301(4). The amount of plays a member received directly correlated with the amount of money he "donated" to the Elks; for every dollar paid into the kiosk, the member received one play and a chance to win a cash prize. Moreover, free plays made up less than ten percent of the total plays; the other 90 per cent involved paying money for the chance to win cash.

## II. Raffle Exception

¶24 The Elks argue the sweepstakes is a lawful raffle under A.R.S. § 13-3302(B). Pursuant to A.R.S. § 13-3302(B), a non-profit organization may lawfully conduct a raffle if it satisfies all of the following restrictions:

1. … no member, director, officer, employee or agent of the nonprofit organization may receive any direct or indirect pecuniary benefit other than being able to participate in the raffle on a basis equal to all other participants.

2. The nonprofit organization has been in existence continuously in this state for a five year period immediately before conducting the raffle.

3. No person except a bona fide local member of the sponsoring organization may participate directly or indirectly in the management, sales or operation of the raffle.

¶25 There is no dispute the Elks' sweepstakes satisfies the requirements of A.R.S. §§ 13-3302(B)(1), (2). Moreover, we need not address whether the Elks' sweepstakes is a raffle, because the dispositive issue on appeal is whether Patriots participated in the management or operation of the sweepstakes pursuant to A.R.S. § 13-3302(B)(3).

¶26 In determining what constitutes direct or indirect participation in the management of a raffle under A.R.S. § 13-3302(B) (3), the Arizona Attorney General has opined that the receipt of lease payments "based upon a percentage of sales or receipts from conduct of the games" constitutes "direct or indirect participation in sales or operation of the raffle." 1990 Ariz. Op. Att'y Gen. 57 (1990). *See Ruiz v. Hull*, 191 Ariz. 441, 449, ¶ 28 (1998) (stating that although attorney general opinions are advisory, they may be used as persuasive authority).

¶27 The record supports the Department's conclusion Patriots indirectly participated in the management of the sweepstakes. Patriots monitored the revenue generated by members purchasing plays, the cash prize money paid to members, and the free plays used by members. Patriots provided the rules for the sweepstakes, and processed requests for free plays mailed to its office. Patriots also provided the Elks with extensive operational support for the sweepstakes, consisting of training, equipment maintenance, software updates, and computer and equipment repairs. In return for its management and operational support, Patriots received 55% of the net proceeds generated by the sweepstakes.

¶28 Therefore, we affirm the Department's decision the Elks' sweepstakes is not a lawful raffle under A.R.S. § 13-3302(B).

## III. Knowingly Requirement: A.R.S. § 4-244(26)

**¶29** Finally, the Elks contend the Department erred in affirming the ALJ's construction of A.R.S. § 4-244(26). In determining the Elks violated A.R.S. § 4-244(26), the ALJ concluded the term "knowingly" in the statute only requires proof the Elks knew the sweepstakes were being conducted on its premises; it does not require proof the Elks knew the sweepstakes were unlawful. The Elks assert this construction of the statute is erroneous, and that the statute requires proof the Elks: (1) knowingly permitted the sweepstakes to operate on its premises, and (2) knew the sweepstakes were unlawful.

**¶30** When interpreting a statute, "we look to the plain language of the statute as the best indicator" of the legislature's intent. *State v. Pledger,* 236 Ariz. 469, 471, ¶ 8 (App.2015); *see also Hoag v. French,* 238 Ariz. 118, 121, ¶ 11 (App. 2015). "[U]nless the drafters provide special definitions or a special meaning is apparent from the text," we give the words and phrases of the statute their commonly accepted meaning. *Pledger,* 236 Ariz. at 471, ¶ 8, 341 P.3d 511; *Hoag,* 238 Ariz. at 121, ¶ 11. "If the statute is clear and unambiguous, we apply the plain meaning of the statute" without resorting to other methods of statutory construction. *Stein v. Sonus USA, Inc.,* 214 Ariz. 200, 201, ¶ 3 (App. 2007) (citation omitted).

**¶31** Based on the plain meaning of "knowingly" as used in A.R.S. § 4-244(26), the Department was not required to prove the Elks knew the sweepstakes were unlawful. The word knowingly, when used in Arizona's statutes, "[d]oes not require any knowledge of the unlawfulness of the act or omission." A.R.S. § 1-215(17) (b); *see* A.R.S. § 13-105(10) (b) (stating that the term "knowingly," when describing conduct constituting a criminal offense, "does not require any knowledge of the unlawfulness of the act or omission"). This construction is consistent with the well-settled principle that ignorance of the law is not a defense. A.R.S. § 13-204(B); *State v. Morse,* 127 Ariz. 25, 31 (1980).

**¶32** Accordingly, we conclude the ALJ correctly construed A.R.S. § 4-244(26).

## CONCLUSION

¶33     For the foregoing reasons, we affirm.  Because the Elks is not the prevailing party on appeal, we deny its request for fees.



Ruth A. Willingham · Clerk of the Court
FILED: ama