IN THE
# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

CENTER FOR ARIZONA POLICY INC, et al., *Plaintiffs/Appellants*,

*v.*

ARIZONA SECRETARY OF STATE, et al., *Defendants/Appellees*,

KRISTIN MAYES, ARIZONA ATTORNEY GENERAL, et al.,
*Intervenors/Appellees*.

No. 1 CA-CV 24-0272 A

---

FILED 11-08-2024

---

Appeal from the Superior Court in Maricopa County
No. CV2022-016564
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

---

COUNSEL

Scharf-Norton Center for Constitutional
Litigation at the Goldwater Institute, Phoenix
By Jonathan Riches, Scott Day Freeman, Parker Jackson
*Co-Counsel for Plaintiffs/Appellants*

Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix
By Andrew Gould, Emily Gould, Brennan A.R. Bowman, Daniel Tilleman,
Oliver Roberts
*Co-Counsel for Plaintiffs/Appellants*

Osborn Maledon, P.A., Phoenix
By Eric M. Fraser, Mary R. O'Grady, Alexandria N. Karpurk
*Counsel for Defendant/Appellee, Arizona Citizens Clean Elections Commission*

Sherman & Howard LLC, Phoenix
By Craig A. Morgan, Shayna Stuart
*Counsel for Defendant/Appellee, Arizona Secretary of State Adrian Fontes*

Arizona Center for Law in the Public Interest, Phoenix
By Daniel J. Adelman, Chanele N. Reyes
*Co-Counsel for Intervenor/Appellee, Voters' Right to Know*

Campaign Legal Center, Washington D.C.
By David Kolker, Tara Malloy, Elizabeth D. Shimek (*pro hac vice*)
*Co-Counsel for Intervenor/Appellee, Voters' Right to Know*

Office of the Arizona Attorney General, Phoenix
By Alexander W. Samuels, Nathan T. Arrowsmith, Kathryn E. Boughton
*Counsel for Intervenor/Appellee, Arizona Attorney General*
*Kristin Mayes*

Statecraft PLLC, Phoenix
By Kory Langhofer, Thomas Basile
*Counsel for Amicus Curiae Arizona Women of Action*

Arizona Chamber of Commerce & Industry, Phoenix
By Nate Curtisi
*Counsel for Amicus Curiae Arizona Chamber of Commerce & Industry*

Greenberg Traurig, LLP, Phoenix
By Dominic E. Draye
*Counsel for Amici Curiae Americans for Prosperity & Americans for Prosperity Foundation*

Snell & Wilmer L.L.P., Phoenix
By Brett W. Johnson, Tracy A. Olson, Ryan P. Hogan, Charlene A. Warner
*Counsel for Amici Curiae Speaker Ben Toma and President Warren Petersen*

Office of the Phoenix City Attorney, Phoenix
By Deryck R. Lavelle, Dustin S. Cammack
*Counsel for Amicus Curiae City of Phoenix*

---

## OPINION

Presiding Judge Jennifer B. Campbell delivered the opinion of the Court, in which Judge Kent E. Cattani and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

**¶1** Does Proposition 211, known as the "Voter's Right to Know Act" (Act), violate the Constitutional protections of free speech, association, privacy, and separation of powers? In this opinion, we review the superior court's rulings granting the defendants' and intervenors' (collectively, Defendants') motions to dismiss and denying their requests for injunctions on claims alleging that the Act violates the Arizona Constitution. For the reasons below, we affirm.

### BACKGROUND

### I. The Act

**¶2** In November 2022, Arizona voters approved Proposition 211. The Act aims to stop "dark money" in Arizona politics. 2022 Ariz. Legis. Serv. Prop. 211 § 2(C). The Act seeks to regulate "the practice of laundering political contributions, often through multiple intermediaries, to hide the original source." *Id.*

**¶3** To achieve that purpose, the Act requires a "covered person" to disclose the original source of campaign donations exceeding $5,000 used for "campaign media spending." *See* A.R.S. § 16-973(A). A "covered person" is "any person [or entity] whose total campaign media spending . . . in an election cycle is more than $50,000 in statewide campaigns or more than $25,000 in any other type of campaigns." A.R.S. § 16-971(7)(a). This definition excludes "candidate committee[s]," individuals spending only their own monies, organizations spending only their own business income, and political action committees (PACs) or political parties receiving no more than $20,000 in contributions from any one person in an election cycle. A.R.S. § 16-971(7)(b).

**¶4** "Campaign media spending" means spending for certain enumerated election-related "public communication[s]," "activit[ies] . . . that support[] the election or defeat of candidates . . . or political part[ies],"

3

and "[r]esearch, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with any of the" enumerated public communications or activities. A.R.S. § 16-971(2)(a)(i)–(vii). This definition excludes certain spending, including spending to disseminate news or commentary, publish books or documentaries, encourage voter participation, or facilitate candidate debates. A.R.S. § 16-971(2)(b)(i)–(iv).

¶5          Both covered persons and qualifying donors—those contributing more than $5,000 during an election cycle—have recordkeeping responsibilities. A.R.S. § 16-972(D). Covered persons must maintain "transfer records" documenting "the identity of each person that directly or indirectly contributed or transferred more than $2,500 of original monies used for campaign media spending." A.R.S. §§ 16-971(19), 16-973(A). In other words, covered persons must document the original source of a contribution and anyone possessing the funds before they reach the covered person. Donors giving more than $5,000 to a covered person during an election cycle must report to the covered person the identity of anyone who contributed more than $2,500 of those funds. A.R.S. § 16-972(D). If the funds were conglomerated, the donor must identify intermediaries who transferred or donated more than $2,500 and identify those intermediate transactions. *Id.* This must be done within ten days after being requested by the covered person. *Id.*

¶6          Covered persons are also tasked with disclosure requirements. "Within five days after spending" at least $50,000 on campaign media in statewide campaigns or at least $25,000 on campaign media in any other type of campaign during an election cycle, covered persons must file a report with the Arizona Secretary of State (the Secretary). A.R.S. § 16-973(A). Each donor contributing more than $5,000 of original monies used for campaign media spending must be listed. A.R.S. § 16-973(A), (G). The Secretary will "promptly make the information public." A.R.S. § 16-973(H). Additionally, covered persons must include a disclaimer in public communications, stating "the names of the . . . donors who directly or indirectly made the three largest contributions of original monies [to them] during the election cycle." A.R.S. § 16-974(C).

¶7          Donors who prefer to remain anonymous may opt out of having their contributions used for campaign media spending, ensuring their identities are never made public. A.R.S. § 16-972(B). Before a covered person can use contributions for campaign media spending, they must give the donor written notice of the opt-out provision. *Id.* The covered person shall not use the donated funds for campaign media spending for 21 days

4

unless the donor waives the waiting period by written consent. A.R.S. 16-972(C). There are additional protections for original donors, whose identities "shall not be disclosed or included in a disclaimer" if (1) "there is a reasonable probability that public knowledge of the original source's identity would subject the source or [their] family to a serious risk of physical harm," or (2) the donor's identity is "otherwise protected from disclosure by law or a court order." A.R.S. § 16-973(F).

¶8          The Arizona Clean Elections Commission (the Commission) is empowered to "implement and enforce" the disclosure requirements in the Act. A.R.S. § 16-974(A). The Commission may, among other things, (1) "adopt and enforce rules," (2) "initiate enforcement actions," (3) "[i]mpose civil penalties for noncompliance," (4) "seek . . . relief in court as necessary," and (5) "[p]erform any other act that may assist in implementing [the Act]." A.R.S. § 16-974(A)(1)–(8). The Act provides that the Commission's rules and enforcement actions "are not subject to the approval of or any prohibition or limit imposed by any other executive or legislative governmental body or official." A.R.S. § 16-974(D). Voters may file "verified complaint[s]" with the Commission alleging a person has violated the Act. A.R.S. § 16-977(A).

## II.    Procedural Background

¶9          Two organizations and two individuals (collectively, Plaintiffs) filed a verified complaint challenging the Act's constitutionality. Plaintiffs named the Secretary and the Commission as defendants. The Arizona Attorney General and Voters' Right to Know, the Act's sponsoring organization, intervened to defend the Act.

¶10         The two plaintiff organizations, the Center for Arizona Policy Inc. (CAP) and the Arizona Free Enterprise Club (FEC), are nonprofit, tax-exempt organizations considered covered persons under the Act.[1] CAP describes itself as a "statewide research and education organization that seeks to promote and defend foundational principles of life, marriage, family, and religious freedom." FEC is a "statewide research and public policy organization that advocates for principles of free enterprise and pro-growth, limited government policies through extensive public education, lobbying, and grassroots activity, including hosting public policy events, issuing policy papers, and communicating with individual citizens, the media, and policymakers on public policy." The individual plaintiffs are

---

[1]      In this opinion, we assume that both CAP and FEC are covered persons under the Act for this election cycle.

both citizens of Arizona who donate to organizations engaging in campaign media spending. Both individuals wish to remain anonymous.

¶11 Plaintiffs assert that the Act facially violates the free speech and private affairs clauses of the Arizona Constitution. They also argue the Act violates the separation of powers clause of the Arizona Constitution by granting "the Commission plenary power to write its own rules, to interpret them, and to enforce them." Plaintiffs requested declaratory relief and moved to enjoin implementation of the entire Act preliminarily. Defendants opposed the injunction and moved to dismiss the complaint.

¶12 At oral argument, Plaintiffs maintained that the complaint "was also an as applied challenge to the Act's constitutionality." After the argument, the superior court dismissed Plaintiffs' complaint and denied their injunction request. However, the court granted Plaintiffs leave to file an amended complaint, allowing them to raise an as-applied challenge.

¶13 Plaintiffs then filed an amended complaint asserting that the Act was unconstitutional as applied. As in the first complaint, Plaintiffs sought declaratory and injunctive relief. Plaintiffs filed a renewed motion for a preliminary injunction. Defendants moved to dismiss the amended complaint and opposed the renewed preliminary injunction request.

¶14 After oral argument, the superior court dismissed the amended complaint and denied the renewed motion for a preliminary injunction. Plaintiffs timely appealed.

## DISCUSSION

¶15 Plaintiffs argue that the superior court erred by (1) dismissing their facial free speech challenge; (2) dismissing their as-applied free speech challenge; (3) dismissing their private affairs challenge; (4) dismissing their separation of powers challenge; and (5) denying their requests for preliminary injunction. We review de novo the dismissal of a complaint under Rule 12(b)(6). *Coleman v. City of Mesa*, 230 Ariz. 352, 355, ¶ 7 (2012). "Dismissal is appropriate under Rule 12(b)(6) only if 'as a matter of law [] plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof.'" *Id.* at 356, ¶ 8 (citation omitted). Moreover, to determine whether a "complaint states a claim on which relief can be granted, courts must assume the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts, but mere conclusory statements are insufficient." *Id.* at ¶ 9.

## I. Facial Free Speech Claim

¶16 The court concluded that "the Act survives exacting scrutiny and does not violate the First Amendment." In reaching that conclusion, it explained that the Act "is substantially related to sufficiently important government interests" and is "narrowly tailored" to those interests. Plaintiffs argue that the court incorrectly applied exacting scrutiny instead of strict scrutiny. They posit that under either test, the Act must be struck down because its disclosure requirements violate the free speech guarantees of the Arizona Constitution.

### A. Standard of Review

¶17 Plaintiffs acknowledge that under federal precedent, exacting scrutiny is the correct standard to evaluate whether election-related disclosure laws violate the First Amendment. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366–67 (2010). But, since the Arizona Supreme Court has never addressed what level of scrutiny to apply to a compelled disclosure law and has traditionally applied strict scrutiny to content-based laws, which Plaintiffs claim the Act to be, they urge us to do likewise. *See Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 292, ¶ 96 (2019). Exacting scrutiny requires "'a substantial relation between the disclosure requirement and a sufficiently important governmental interest' and that the disclosure requirement be narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021) (citation omitted). On the other hand, under strict scrutiny, the law "must adopt 'the least restrictive means of achieving a compelling state interest.'" *Id.* at 607 (citation omitted).

¶18 Our courts have "often relied on federal case law in addressing free speech claims under the Arizona Constitution." *Brush & Nib Studio*, 247 Ariz. at 282, ¶ 46. While the parties dispute whether the Act's disclosure requirements are content-based or content-neutral, federal courts apply exacting scrutiny in either case. *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976) (recognizing that exacting scrutiny applies generally to compelled disclosure laws), *superseded by statute on other grounds as recognized in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345–46 (1995) (applying exacting scrutiny to a content-based law banning anonymous campaign literature). This is because while disclosure laws "may burden the ability to speak, they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'" *Comm. for Just. & Fairness (CJF) v. Ariz. Sec'y of State's Off.*, 235 Ariz. 347, 355–56, ¶ 33 (App. 2014) (citation omitted); *see also*

*Citizens United*, 558 U.S. at 369 (applying exacting scrutiny because "disclosure is a less restrictive alternative to more comprehensive regulations of speech"). Relying on federal precedent, this court has also applied exacting scrutiny to review disclosure requirements. *CJF*, 235 Ariz. at 355–56, ¶¶ 33–35.

¶19 Still, Plaintiffs urge us to part ways with the exacting scrutiny standard and apply strict scrutiny because the Arizona Constitution "provides broader protections for free speech than the First Amendment [of the United States Constitution]." *See Brush & Nib Studio*, 247 Ariz. at 281, ¶ 45. While true, nothing suggests that the Arizona Constitution provides enhanced campaign finance disclosure protections. In fact, its plain language suggests the opposite. Article VII, Section 16 mandates that the legislature enact a disclosure law to publicize "all campaign contributions to, and expenditures of campaign committees and candidates for public office." *See also* Ariz. Const. art. VII, § 12 (requiring the legislature to enact laws ensuring the purity of elections). By expressly mandating the disclosure of campaign contributions, the framers of the Arizona Constitution in fact highlighted an intent to compel the disclosure of the identities of persons and groups contributing money to influence elections. *See State v. Mixton*, 250 Ariz. 282, 289, ¶ 28 (2021) ("Our primary purpose when interpreting the Arizona Constitution is to" effectuate the framers' intent.)

¶20 Plaintiffs argue that the Arizona Constitution's mandated disclosure of contributions to campaigns or candidates, contrasted with no disclosure requirement for contributions to non-candidates or non-campaign organizations, expresses the framers' intent to give enhanced protection to the latter. But, Plaintiffs have not put forth any evidence that the framers intended to protect donors to unaffiliated entities or even contemplated this kind of entity when enacting Article VII, Section 16. The Act and Article VII, Section 16 were designed to fight corruption and undue influence in elections. *See* John D. Leshy, *The Arizona State Constitution* 16 (2d. ed. 2013); 2022 Ariz. Legis. Serv. Prop. 211 § 2(B) ("This act is intended to . . . prevent corruption" and inform Arizona voters of "the source of monies used to influence Arizona elections."). Given this, Article VII, Section 16 exhibits the framers' intent to give more deference to transparency in election financing.

¶21 Finally, the applicable level of scrutiny is based on the "severity of the burden on" free speech rights, not on the level of protection afforded by the Arizona Constitution. *See Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, 249 Ariz. 396, 409, ¶ 42 (2020) ("Restrictions

imposing a 'severe burden' are subject to strict scrutiny," however, laws that "impose[] only 'reasonable, nondiscriminatory restrictions,' trigger less exacting review." (citations omitted)). Here, we apply exacting scrutiny because the laws at issue "implicate only disclosure requirements," which again, "do not prevent anyone from speaking" or impose ceilings on campaign-related activities. *CJF*, 235 Ariz. at 356, ¶¶ 33–34 (citing *Citizens United*, 558 U.S. at 366). Because the Act does not limit free speech or any campaign-related activities, we find the Act should be analyzed under the less rigorous standard—exacting scrutiny. *See id.*

### B.    Applying Exacting Scrutiny

**¶22**        Exacting scrutiny requires (1) "a substantial relation between the disclosure requirement and a sufficiently important government interest" and (2) that the disclosure regime be "narrowly tailored to the interest it promotes." *Bonta*, 594 U.S. at 611 (citation omitted).

### 1.    Substantially Related to a Sufficiently Important Government Interest

### a.    Sufficiently Important Interest

**¶23**        "The strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* at 607. Both federal and Arizona courts recognize important government interests "in the disclosure of the sources of campaign funding." *See No on E v. Chiu*, 85 F.4th 493, 504 (9th Cir. 2023); *CJF*, 235 Ariz. at 360, ¶ 48. Those interests include informing voters and deterring corruption by permitting voters to assess whether donors receive post-election favors. *Buckley*, 424 U.S. at 66–68.

**¶24**        Plaintiffs concede that the State has "interests in having an informed electorate and avoiding corruption." Plaintiffs do not dispute that these interests are important enough to justify some disclosure requirements.[2] The Supreme Court has repeatedly held as much. *See Buckley*, 424 U.S. at 66–68 (upholding disclosure requirements and noting that providing the electorate information related to campaign finance serves various governmental interests); *see also Citizens United*, 558 U.S. at

---

[2]        Amici urge us to consider whether the informational interests are sufficiently important to justify the burdens imposed by the Act. "[W]e base our opinion solely on legal issues advanced by the parties themselves." *See Ruiz v. Hull*, 191 Ariz. 441, 446, ¶ 15 (1998). We do find the interests sufficiently important to justify the burdens imposed.

369 (finding the public's "informational interest" in "knowing who is speaking about a candidate shortly before an election" sufficient to support a law requiring disclosure of funding sources); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 196 (2003) (recognizing that "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof" are "important state interests"), *overruled on other grounds by Citizens United*, 558 U.S. 310. Plaintiffs contend that the Act's disclosure requirements impose heavy burdens on would-be donors' rights to associate freely and that the State's interests are insufficient to justify these burdens. We disagree.

**¶25** In some respects, Arizona's constitution is more protective of free speech rights than the federal constitution. *Coleman*, 230 Ariz. at 361, ¶ 36 n.5. Nothing in the text of the Arizona Constitution or its history suggests that it provides greater protection for association rights than the First Amendment to the United States Constitution. *See* Ariz. Const. art. II, § 5. We look to federal precedent to determine whether the Act impermissibly burdens association rights.

**¶26** "In determining whether [government] interests are sufficient to justify [disclosure] requirements we must look to the extent of the burden that they place on individual rights." *Buckley*, 424 U.S. at 68. Plaintiffs assert that the Act encumbers donors' right to "freely associate" because "the disclosures effectively dox[3] donors and expose them to retaliation." But donors are free to associate anonymously with a "covered" entity to the extent they desire. The association only becomes public if the donor chooses to allow their contributions to be used for political media campaigns. *See* A.R.S. § 16-972(B).

**¶27** To support their claim, CAP and FEC refer to several allegations of threats and harassment against their staff. Plaintiffs' particularized allegations of the Act's chilling effect cannot support a facial challenge, which requires showing that "donors to a substantial number of organizations will be subjected to harassment and reprisals." *Bonta*, 594 U.S. at 617; *see also Buckley*, 424 U.S. at 68 (denying a facial challenge while recognizing that disclosure requirements will "undoubtedly . . . deter some

---

3       "Dox" is a verb that means: "to reveal information about somebody on the internet, usually in order to harm them." Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/definition/english/dox?q=dox (last visited Nov. 6, 2024).

individuals" from contributing); *No on E*, 85 F.4th at 508 (showing only a "modest burden" is insufficient (citation omitted)).

**¶28** The government has strong informational and anti-corruption interests, which are sufficiently important to justify the modest burden the Act places on donors' association rights. *See Buckley*, 424 U.S. at 66–68; *No on E*, 85 F.4th at 508–09.

### b. Substantially Related

**¶29** The next prong in an exacting scrutiny analysis is determining whether the Act is "substantially related" to the government's interests. *Bonta*, 594 U.S. at 611. The Act aims to regulate "the practice of laundering political contributions, often through multiple intermediaries, to hide the original source." 2022 Ariz. Legis. Serv. Prop. 211 § 2(C). Plaintiffs try to draw an analogy between the Act and the regulation in *Bonta*. But political campaign expenditures were not at issue in that case. The Supreme Court held that a California regulation requiring charities to disclose large donations failed under an exacting scrutiny analysis. *Bonta*, 594 U.S. at 602, 612. The Court found that the government's true interest was "administrative convenience," not justifying the burdens imposed by the disclosure requirements. *Id.* at 614–15, 618. The Act is not analogous.

**¶30** Plaintiffs fail to articulate why the Act's disclosure requirements are not substantially related to the State's interest in having an informed electorate. *See Citizens United*, 558 U.S. at 369 ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election."). Federal courts have held that laws requiring disclosure of the original source of election-related contributions substantially relate to a state's interests in informing the electorate. *See Smith v. Helzer*, 95 F.4th 1207, 1212, 1216 (9th Cir. 2024) (requiring contributors to report the "true sources of the contribution" is "substantially related to the state's asserted informational interest"); *see also Gaspee Project v. Mederos*, 13 F.4th 79, 82, 88, 95–96 (1st Cir. 2021) (holding that a law requiring disclosure of funding sources for electioneering communications bears a substantial relation to ensuring a well-informed electorate); *No on E*, 85 F.4th at 506 ("Because the interest in learning the source of funding for a political advertisement extends past the entity that is directly responsible, the challenged ordinance is substantially related to the governmental interest in informing the electorate."). And "[b]ecause the informational interest alone is sufficient to justify" disclosure laws, we need not consider the other asserted interests. *Citizens United*, 558 U.S. at 369.

¶31            Still, in our discretion, we address Plaintiffs' argument related to the State's interest in preventing corruption. Plaintiffs contend that because nonprofits and PACs cannot coordinate with or donate to candidates, contributions to these entities create "no possibility of corruption or the appearance of corruption." Not so.

¶32            Plaintiffs' narrow view of corruption glosses over the reality that donors may support a candidate by contributing to an independent entity that supports the candidate's policy positions. In so doing, donors may exchange their indirect monetary support for political favors once the candidate is elected. At that point, the same corruption concerns exist as if the donor had contributed to the candidate directly. Voters should also be allowed to discern the source of funds used to influence the adoption or rejection of ballot and referendum measures. If out-of-state donors pour donations into nonprofit organizations seeking to influence Arizona elections, voters have an informational interest in the disclosure of the identities of the advocacy group's donors.

¶33            Without the Act's disclosure requirements, the public could never evaluate the true source of the funds hidden by filtering through front groups or intermediaries. *See McConnell*, 540 U.S. at 197 ("'[U]ninhibited, robust, and wide-open' speech [cannot] occur when organizations hide themselves from the scrutiny of the voting public." (citation omitted)); *see also Citizens United*, 558 U.S. at 370 ("[P]rompt disclosure of [independent] expenditures can provide . . . citizens with the information needed to hold . . . elected officials accountable," as "citizens can see whether elected officials are in the pocket of so-called moneyed interests." (citation and internal quotation marks omitted)). On this basis, the Act is substantially related to the important government interest in preventing corruption.

## 2.       Narrowly Tailored to the Government's Interests

¶34            Plaintiffs argue that the Act's disclosure requirements are not narrowly tailored to the government's interests because it is "riddled with" overbroad and vague provisions. They point to "the top-three donor disclosure requirement, the disclosure of donors whose money flows to the preparation of campaign ads (earmarked or not), and the arbitrary disclosure thresholds." "[E]xacting scrutiny requires that a government-mandated disclosure regime be narrowly tailored to the government's asserted interest, even if it is not the least restrictive means of achieving that end." *Bonta*, 594 U.S. at 597. But the regime must also reflect a "reasonable fit" between the burdens imposed and the state interests advanced. *Gaspee Project*, 13 F.4th at 88. A disclosure requirement is unconstitutionally

overbroad "if a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Bonta*, 594 U.S. at 615 (citation omitted); *see also CJF*, 235 Ariz. at 356, ¶ 35 n.16.

### a.       Top-three Donor Provision

**¶35**          Plaintiffs challenge, as overbroad and vague, the Act's provision requiring covered persons to include a disclaimer in their public communications stating the names of their "top three donors . . . during [an] election cycle." *See* A.R.S. § 16-974(C). Plaintiffs assert that a top-three donor who opted out under § 16-972(B) would not be exempt from being listed in disclaimers under § 16-974(C). Plaintiffs argue that this provision is not narrowly tailored to inform voters of the funding source for election communications because it could compel disclosure of donors "who have not contributed a single dollar to campaign media spending." However, Plaintiffs' argument rests on their proposed interpretation—that this requirement "applies to donors who 'opted out' from campaign media spending under [§] 16-972(B)."

**¶36**          Our primary purpose in interpreting a statute "is to effectuate the intent of those who framed" it—for an initiative, "the intent of the electorate that adopted it." *Calik v. Kongable*, 195 Ariz. 496, 498, ¶ 10 (1999) (citation omitted). We interpret statutory language in view of the entire text, considering the overall context. *Nicaise v. Sundaram*, 245 Ariz. 566, 568, ¶ 11 (2019). Ambiguity exists "when the language is reasonably susceptible to differing interpretations." *Romero-Millan v. Barr*, 253 Ariz. 24, 27, ¶ 13 (2022). To resolve ambiguity, we look to secondary interpretation methods, including "the statute's subject matter, historical background, effect and consequences, and spirit and purpose." *State v. Luviano*, 255 Ariz. 225, 228, ¶ 10 (2023) (citation and internal quotation marks omitted). We construe "ambiguous statutes, when possible, in a way that preserves the statute's constitutionality." *AZ Petition Partners LLC v. Thompson*, 255 Ariz. 254, 258, ¶ 17 (2023).

**¶37**          The Act does not address the interplay between § 16-972(B)'s opt-out provision and § 16-972(C)'s top-three donor disclosure requirement. As a result, the Act is reasonably susceptible to multiple interpretations regarding whether the top-three donors may opt out from being included in disclaimers under § 16-974(C). But the Commission has promulgated a regulation clarifying that donors who have opted out shall not be included in the disclaimer of top-three donors. *See* A.A.C. R2-20-805(B). Thus, Plaintiffs' fears are unfounded.

¶38 Moreover, even without the promulgated regulation, the ambiguity does not render the Act unconstitutionally vague. *See State v. Johnson*, 243 Ariz. 41, 44, ¶ 9 (App. 2017) ("Furthermore, '[a] statute is not unconstitutionally vague solely because . . . the provision is susceptible to more than one interpretation.' In such a situation, we [consult secondary interpretation methods]." (citation omitted)).

¶39 When a donor opts out under § 16-972(B), their contribution cannot be used for campaign media spending. Under Plaintiffs' interpretation, a top-three donor that opts out must have their identity disclosed under § 16-974(C), even though their contribution cannot be used for campaign media spending. The Act's purpose is to inform the electorate of "the original source of all major contributions used to pay, in whole or part, for campaign media spending." 2022 Ariz. Legis. Serv. Prop. 211 § 2(A). If we were to adopt Plaintiffs' interpretation, it would negate the purpose of the Act by informing the electorate of the identities of donors whose contributions were *not* used for campaign media spending. Accordingly, Plaintiffs' interpretation does not further the Act's purpose and would lead to illogical results. Instead, we agree with the Commission's regulation and independently conclude that donors who opt out under § 16-972(B) shall not have their identities included in the disclaimers of top-three donors under § 16-974(C). *See Barriga v. Ariz. Dep't of Econ. Sec.*, 256 Ariz. 489, 493, ¶ 13 (2024) ("We do not defer to the agency's interpretation of a rule or statute." (citation omitted)). This interpretation carries out the intent of the electorate who adopted the Act and preserves its constitutionality. *See Calik*, 195 Ariz. at 498, ¶ 10; *AZ Petition Partners*, 255 Ariz. at 258, ¶ 17.

### b.    Lack of Earmarking

¶40 Plaintiffs next argue that the Act is overbroad and not narrowly tailored to informational interests because it "requires disclosure of donors who *did not* earmark funds for campaign media spending — and may never have intended that their donations be used for campaign media spending." Plaintiffs point to cases finding disclosure requirements narrowly tailored to informational interests in part because they only required disclosure of contributions that were specifically earmarked for electioneering purposes (campaign media spending under the Act). *See, e.g., Indep. Inst. v. Williams*, 812 F.3d 787, 797–98 (10th Cir. 2016).

¶41 But exacting scrutiny does not require that the Act use the "least restrictive means" to achieve its interests; only a "reasonable fit" is required. *Bonta*, 594 U.S. at 597; *Gaspee Project*, 13 F.4th at 88. And as

explained above, we reject Plaintiffs' assertion that persons exercising the opt-out provision would be disclosed to the public under the Act. Even so, the fact that the Act *could have* been more narrowly tailored by requiring donations to be earmarked explicitly for campaign media spending does not mean it *must* contain such an earmarking requirement. In fact, the U.S. Supreme Court, applying exacting scrutiny, upheld a law requiring disclosures of contributions not expressly earmarked for electioneering communications. *McConnell*, 540 U.S. at 194–95, 201–02 (upholding a law requiring a disclosure statement identifying "*all* persons who contributed $1,000 or more to [an] account or [] individual" that then made more than $10,000 in disbursements for electioneering communications (emphasis added)).

**¶42**        Although the Act contains no earmarking requirement, it protects donors' identities by mandating they be notified that they may opt out or their identity may be disclosed. A.R.S. § 16-972(B). Should they opt out of contributing to campaign media spending, their identities would remain protected. The opt-out provision narrows the breadth of the Act, tailoring it to its informational and anti-corruption interests. *See Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 462 (2001) ("The earmarking provision . . . would reach only the most clumsy attempts to pass contributions through to candidates. To treat the earmarking provision as the outer limit of acceptable tailoring would disarm any serious effort to limit the corrosive effects of [*quid pro quo* corruption]."). We reject Plaintiffs' contention that the Act is overbroad because its disclosures are not limited to contributions earmarked for campaign media spending.

### c.        Arbitrary Thresholds

**¶43**        The Act compels disclosure of information about donors who, during an election cycle, contribute more than $5,000 to a covered person that, during that cycle, spends at least $50,000 on campaign media in statewide campaigns or at least $25,000 in any other type of campaign. A.R.S. § 16-973(A)(6). Plaintiffs argue that these thresholds are arbitrary and not narrowly tailored. In essence, Plaintiffs assert that the Act is underinclusive because it does not regulate all election spending.

**¶44**        A law "need not address all aspects of a problem in one fell swoop," as "the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) (citation omitted). The threshold amounts in the Act do not decrease the Act's level of tailoring simply because they could have been lower. *See id.* ("We [uphold] laws—even under strict scrutiny—that

conceivably could have restricted even greater amounts of speech in service of their stated interests."). The larger dollar amounts more narrowly tailor the Act by removing the disclosure burden on ordinary citizens who make modest campaign contributions and decreasing the reporting obligations on the covered persons. The larger donation amounts triggering disclosure target donors most likely to influence politicians and elections. Therefore, the Act's disclosure thresholds are narrowly tailored and "aim[] squarely at the conduct most likely to undermine" the government's interests—fair and transparent elections. *See id.*

### d. "in preparation for or in conjunction with"

**¶45** The Act requires the disclosure of contributions spent on "campaign media spending." A.R.S. § 16-973(A). "Campaign media spending" is defined in § 16-971(2)(a)(i)–(vi) as election-related "public communication[s]" and in § 16-971(2)(a)(vii) as "[r]esearch, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with any of the activities described in items (i) through (vi)." Plaintiffs argue that the Act is unconstitutionally vague because the phrase "in preparation for or in conjunction with" does not outline what campaign media spending includes, leaving "citizens . . . to guess how far in advance would the preparation need to be."

**¶46** A statute is "unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) (citation omitted). But "perfect clarity is not required even when a law regulates protected speech." *Id.* (citation omitted). The law must only provide "a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). The touchstone is "whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices"—"difficulty in determining whether certain marginal [scenarios] are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness." *Jordan v. De George*, 341 U.S. 223, 231–32 (1951). Given the limits of language, "speculation about possible vagueness in hypothetical situations . . . will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications'" and its meaning, on the whole, is clear. *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted). To that end, inherently indeterminate phrases must be limited by their context. *See*

*Maracich v. Spears*, 570 U.S. 48, 59–60 (2013) (recognizing that extending the phrase "in connection with" to its infinite linguistic limit would contravene the statute's design).

**¶47**        Plaintiffs argue that "in preparation for or in conjunction with" is limitless, and list a panoply of hypothetical scenarios concerning activities with attenuated connections to activities specifically defined as campaign media spending. We are unpersuaded. The phrase "in preparation for or in conjunction with" is sufficiently definite to give a person of ordinary intelligence, applying common understanding and practices, fair notice of what is prohibited. *See Williams*, 553 U.S. at 304; *Jordan*, 341 U.S. at 231–32. The Act's meaning, overall, is clear, and Plaintiffs' speculative hypotheticals are unavailing in the facial analysis. *See Hill*, 530 U.S. at 733.

**¶48**        In sum, we conclude that the Act's disclosure requirements are not unconstitutionally vague because they provide large donors and covered persons sufficient notice of what constitutes "campaign media spending" and which donors' information must be disclosed. And the disclosure requirements are not overbroad because none of the applications are unconstitutional in light of the Act's stated goals and objectives. *See Bonta*, 594 U.S. at 615; *Hill*, 530 U.S. at 732 ("[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." (citation omitted)).

## II.    As-Applied Free Speech Claim

**¶49**        Plaintiffs next assert that the superior court erred by dismissing their as-applied free speech claim. When considering an as-applied challenge, we assume the Act is generally constitutional and look to the specific facts and circumstances to determine whether it is unconstitutional as it applies to Plaintiffs. *See Korwin v. Cotton*, 234 Ariz. 549, 559, ¶ 32 (App. 2014). Here, both CAP and FEC alleged that they experienced harassment and intimidation based on their policy positions, and if donors are identified, they too will suffer the same treatment. They posit this speculative harassment will then hinder their ability to fundraise.

**¶50**        The two individual Plaintiffs made similar allegations—speculating that if the public knows of their large donation to a policy group, they will suffer harassment, intimidation, or other forms of retaliation. They then speculate that will cause them to decrease the amount they donate to organizations. They assert that disclosure of their identities would have a chilling effect on their constitutional free speech guarantees,

rendering the Act unconstitutional as applied. The superior court disagreed, dismissing Plaintiffs' amended complaint.

**¶51**         Plaintiffs first contend that the court "improperly weighed" the evidence "at the motion to dismiss stage." They argue this was "reversible error, because the trial court is required to 'assume the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts.'" *See Coleman*, 230 Ariz. at 356, ¶ 9. But contrary to Plaintiffs' claim, the superior court did assume the truth of the factual allegations. In rendering its decision, the court found that "name calling, offensive comments and criticism are certainly rude," but do not rise to the level of harassment or threats of bodily harm that have supported as-applied challenges to disclosure requirements. *See Bates v. City of Little Rock*, 361 U.S. 516, 523–24 (1960) ("There was substantial uncontroverted evidence that public identification of persons in the community as members of the organizations had been followed by harassment and threats of bodily harm."). Many of the comments Plaintiffs convey in support of their as-applied challenge constitute protected political speech, and none rise to the level of "true threats" or "fighting words.[4]" *See Watts v. U.S.*, 394 U.S. 705, 707–08 (1969) (finding a "very crude offensive method of stating a political opposition" was protected speech, and "we do not see how it could be interpreted otherwise"); *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 519–20, ¶¶ 24, 29 (2005) ("'Fighting words' are . . . 'those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.' . . . . 'True threats' are [] statements . . . [reasonably] 'interpreted . . . as a serious expression of an intention to inflict bodily harm upon or to take the life of [a person].'" (citations omitted)).

**¶52**         Plaintiffs assert the superior court used an "erroneous legal standard" to assess their as-applied challenge. An as-applied challenge may be brought against a facially constitutional election disclosure law if the pleadings show a "reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Citizens United*, 558 U.S. at 367 (citation and internal quotation marks omitted); *see also CJF*, 235 Ariz. at 356, 359, ¶¶ 35, 45 (applying reasonable probability standard to an as-applied challenge under the United States and Arizona Constitutions). "The proof may include, for example, specific evidence of past or present harassment

---

4         These comments include CAP's staff being called "ignorant fascist[s]," "race baiters," "zealot tyrant[s]," and being criticized for "half-measures" on abortion issues, "making money from hate and bigotry," and "turning us into a religious autocracy."

of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient." *Buckley*, 424 U.S. at 74. The superior court also recognized that the only Supreme Court cases sustaining as-applied challenges to disclosure laws were those affecting "minor or dissident parties," where members historically faced "pervasive and severe harassment, involving state action or acquiescence." *See NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (upholding as-applied challenge to disclosure law where petitioner "made an uncontroverted showing" that its members faced clear reprisals because their identities were disclosed); *Bates*, 361 U.S. at 523–24 (allowing as-applied challenge when there was "substantial uncontroverted evidence" that disclosure of members' identities was "followed by harassment and threats of bodily harm," and "fear of community hostility and economic reprisals . . . had discouraged new members from joining . . . and induced former members to withdraw"); *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 99 (1982) (permitting as-applied challenge where evidence showed disclosure laws resulted in "threatening phone calls and hate mail, the burning of [the group's] literature, the destruction of [] members' property, police harassment of a party candidate, and the firing of shots at an [] office," and members were fired due to their association).

¶53        Plaintiffs contend that the superior court "invented a new [] standard" and improperly held that "a party must be a 'minor or dissident party' to properly challenge a disclosure requirement infringing upon free speech rights." Plaintiffs assert that "[u]nder the correct standard [they] have properly stated a claim." Plaintiffs argue that they "proffered extensive evidence of harassment, retaliation, reputational harm, physical harm, economic hardship, and reasonable fear." While the court noted that CAP is not a "minor or dissident party," it did so in the context of noting that all cases in which the standard has been met involved government-related conduct, and found that Plaintiffs have not "alleged the type of pervasive, persistent, or government-sanctioned harassment of its members present in successful [as-applied] challenges.[5]" The court determined that Plaintiffs "failed to allege sufficient facts" to maintain an as-applied challenge.

---

[5]        The court did not make this finding regarding FEC explicitly, but we impute that finding to both organizational Plaintiffs.

¶54        The superior court provided a detailed analysis explaining why Plaintiffs' evidence was insufficient to support their as-applied challenge. As the superior court pointed out:

> CAP also established a political action committee ("PAC") in 2022. CAP's PAC publicly discloses its donors' names, addresses and occupations in reports filed with the Arizona Secretary of State. CAP does not allege that any of these donors have been subjected to or are concerned about threats or reprisals because of disclosure of their donations to CAP's PAC.

¶55        Both CAP's and FEC's associated PACs are already required to disclose the identities of their donors.[6] A.R.S. §§ 16-901(10), 16-926 (requiring PACs to disclose to the Secretary the identities of, inter alia, in-state individuals giving more than $100 in an election cycle). CAP's PAC was founded in 2022. FEC's PAC was founded in 2006. Both have disclosed their donors' information since their founding. Even so, neither asserted threatening or harassing conduct directed at donors, undercutting their as-applied challenges.

¶56        Both organizations submitted declarations from their respective presidents, containing allegations that their staff members have received threatening and harassing phone calls, voicemails, emails, and social media posts in response to the organizations' public activities. CAP then points to two occasions when private security guards were hired because of expected protests in response to its public activities. However, there was no allegation that the protestors harassed or threatened CAP's staff or caused any property damage. Peaceful protests are protected speech and cannot serve as the basis for an as-applied challenge to a disclosure law. *See Cox v. Louisiana*, 379 U.S. 536, 558 (1965); *ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914, 932–34 (E.D. Cal. 2011) (rejecting an as-applied challenge to a disclosure law in part because many of the alleged incidents of "threats, harassment and reprisals . . . are themselves forms of speech protected by the United States Constitution").

¶57        FEC refers to an incident where a staff member's car was keyed while parked near the State Capitol. FEC then asks us to conclude that this was in retaliation for the organization's advocacy activities. But no

---

6        Both PACs' disclosures can be found on the Secretary's website. "We take judicial notice of the records of the Secretary of State." *Mathieu v. Mahoney*, 174 Ariz. 456, 457 n.1 (1993).

one saw the event, and no message was conveyed in the scratches. It is speculative that this was anything but random vandalism.

¶58 Plaintiffs then point to a violent attack suffered by an out-of-state organization that shares similar policy positions. To be sure, "[n]ew parties that have no history upon which to draw" may rely on evidence of threats or reprisals directed against other groups. *Buckley*, 424 U.S. at 74. Because CAP and FEC are not "new parties," the court was not required to consider acts perpetrated against other organizations advocating a similar policy. But, even considering this attack as it relates to CAP and FEC, the act was perpetrated against the organization directly and not its donors. So, this violent act adds little value in assessing the "reasonable probability" that donors will suffer similar attacks.

¶59 What is more relevant is the handful of harassing communications received over CAP's 29-year history and FEC's 18-year history. These examples proffered by Plaintiffs fail to demonstrate the "pervasive" and "persistent" harassment necessary to demonstrate a reasonable probability that the disclosure requirement will result in significant reprisals against donors. This is a necessary showing for an established organization to mount a successful as-applied challenge. *See NAACP*, 357 U.S. at 462; *Bates*, 361 U.S. at 523–24; *Brown*, 459 U.S. at 99.

¶60 Both anonymous Plaintiffs express general concern that they will face harassment and retaliation if their large donations to covered persons are disclosed. But neither alleged any incident where a donor experienced harassment or retaliation because they donated to a covered person's cause.

¶61 Plaintiffs' allegations are too speculative to show a reasonable probability that donors would face threats, harassment, or reprisals because of disclosures required under the Act. The superior court could make that determination without engaging in fact-finding – accepting the allegations as true, Plaintiffs failed to allege facts that would support an as-applied challenge to the superior court's dismissal of their complaint. Even if we were to consider the alleged harassment to be pervasive, each instance was directed at the organizations and their employees. Not one incident of actual donor harassment was alleged. Nor did Plaintiffs' evidence show a reasonable probability that its donors *would* face similar threatening and harassing comments if their information were disclosed. *See Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 542 (9th Cir. 2015) (distinguishing plaintiffs' "conclusory statements that they feared that they *might* be subject to harassment" from "a reasonable probability that [its

members] would face . . . harassment" (citation omitted)). We affirm the dismissal of Plaintiffs' as-applied free speech claim.

## III.    Private Affairs Claim

**¶62**        Plaintiffs next argue that the Act violates Article II, Section 8 of the Arizona Constitution: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The superior court dismissed this claim, finding that "election contributions are not 'private affairs.'" We agree.

**¶63**        In determining the meaning of "private affairs," our Supreme Court looked to the term's "natural, obvious, ordinary meaning" and noted that "[p]rivate" means "affecting or belonging to private individuals, as distinct from the public generally," and "[a]ffairs" means "a person's concerns in trade or property; business." *Mixton*, 250 Ariz. at 290–291, ¶ 33 (citations omitted). The Court has not extended the protections under this clause "beyond the [federal] Fourth Amendment's reach, except in cases involving warrantless home entries." *Id.* at 290, ¶ 32.

**¶64**        Plaintiffs make an *expressio unis alterius* argument that because the Arizona Constitution mandates the disclosure of "all campaign contributions to . . . campaign committees and candidates for public office," Ariz. Const. art. VII, § 16, but not other contributions, the private affairs clause shields anything not covered by that exception, including the contributions to policy-influencing organizations regulated by the Act. But our Supreme Court advised against applying the *expressio unis alterius* canon to interpret the Arizona Constitution. *Earhart v. Frohmiller*, 65 Ariz. 221, 225 (1947); *see also* Ariz. Const. art. II, § 33 ("The enumeration in this Constitution of certain rights shall not be construed to deny others retained by the people.").

**¶65**        The Act only requires disclosure after a person has made a large donation and chosen to allow those funds to be used for campaign media spending, which includes various public communications. A.R.S. §§ 16-971(2), 16-972(B), 16-973(A)(6). Donors to organizations that receive money from private individuals to use in making public declarations on government policy positions can hardly be engaging in a "private affair." Large donors who consent to dedicate their money to campaign communications acknowledge that, under the Act, their identities will be made public. Accordingly, the Act regulates public conduct, which is not covered by the protections of the private affairs clause of the Arizona Constitution. *See Mixton*, 250 Ariz. at 290–91, ¶ 33.

## IV.    Separation of Powers Claim

**¶66**        Plaintiffs also allege that the Act violates the separation of powers in Article III of the Arizona Constitution by providing the Commission with executive, legislative, and judicial powers, with no oversight. The superior court dismissed this claim because "Plaintiffs allege no particularized harm caused by the alleged separation of powers violation."

**¶67**        To establish standing in Arizona, plaintiffs must allege "a distinct and palpable injury" that is individualized and not "generalized harm" shared by "a large class of citizens." *Sears v. Hull*, 192 Ariz. 65, 69, ¶ 16 (1998). Absent standing, we generally decline jurisdiction. *See Bennett v. Brownlow*, 211 Ariz. 193, 195–96, ¶¶ 14–15 (2005); *see also Dobson v. State*, 233 Ariz. 119, 122, ¶ 9 (2013) ("Under Arizona's Constitution, standing is not jurisdictional, but instead is a prudential doctrine . . . .").

**¶68**        Plaintiffs argue that they did allege "distinct, palpable and individualized injuries"—that CAP and FEC, fearing unchecked enforcement actions by the Commission, have been forced to allocate resources to ensure compliance and possibly "refrain from speaking [al]together." But beyond these generalized assertions, Plaintiffs have identified no enforcement action that has or will cause them injury. Nor have they identified any particular actions they have taken or will take to comply with the Act or defend against some future enforcement action. Such "generalized harm" does not confer standing. *See Sears*, 192 Ariz. at 69, ¶ 16.

**¶69**        Next, Plaintiffs argue that they have standing to enforce Article III because it is a "mandatory clause." *See* Ariz. Const. art. II, § 32 ("The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise."). Plaintiffs do not cite any Arizona authority supporting this proposition, nor are we aware of any. Instead, Plaintiffs cite case law from other states. But even these out-of-state cases do not support Plaintiffs' claim of standing here. *See Seattle Sch. Dist. No. 1 of King Cnty. v. State*, 585 P.2d 71, 81–82 (Wash. 1978) (allowing standing to protect individual constitutional rights,[7] and noting particularized harm even under the reduced standing requirements); *Gregory v. Shurtleff*, 299 P.3d 1098, 1109–10, ¶¶ 28–30 (Utah 2013) (finding "public-interest standing" because "the issues [were] unlikely to be raised

---

[7]    Article III of the Arizona Constitution does not protect individual rights.

otherwise" as no other plaintiff emerged in six years since the law's enactment[8] (citation omitted)).

¶70 In the alternative, Plaintiffs ask us to waive the standing requirement because this case presents "exceptional circumstances" and involves "issues of great public importance that are likely to recur." *See Sears*, 192 Ariz. at 71, ¶ 25. They contend that this case is of great public importance because the Act violates Arizonans' free speech rights. But here, Plaintiffs have standing to raise and did raise free speech claims. Those claims were addressed and disposed of above. They cannot then serve as the basis for waiving the "distinct and palpable injury" requirement.

¶71 Plaintiffs also assert that this case is of great public importance because if we allow the Act to violate the separation of powers clause, "then the precedent will be set" that such violations can occur "with impunity." However, holding that Plaintiffs lack standing establishes no precedent on the merits of a separation of powers claim.. We decline to waive the standing requirement, and we affirm the dismissal of Plaintiffs' separation of powers claim.

## V. Preliminary Injunctions

¶72 Finally, Plaintiffs assert that the superior court improperly dismissed its original and renewed requests for preliminary injunction. In affirming the dismissal of Plaintiffs' complaints, we need not address the denial of requests for preliminary injunction.

---

[8] The separation of powers issues of the Act are being litigated in concurrent litigation. *See Toma v. Fontes*, __ Ariz. __, __, 553 P.3d 881 (App. 2024).

## CONCLUSION

**¶73** For all these reasons, we affirm the superior court's orders dismissing all of Plaintiffs' claims and confirming the denial of their injunction requests. We deny Plaintiffs' request for attorneys' fees under A.R.S. § 12-348.



AMY M. WOOD • Clerk of the Court
FILED: AGFV